# EXHIBIT B

Atkinson-Baker Court Reporters
www.depo.com

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

EASTERN DIVISION

------------------------------------------------

YENMA PRENDERGAST,

                    Plaintiff,

 -vs-                          1:17-cv-00316

FIRST CHOICE ASSETS, LLC,

                    Defendant.
------------------------------------------------

   Videoconferenced Examination Before Trial
of DAVID J. MACZKA, held before Carrie A.
Fisher, Notary Public, at the law offices of
Lippes Mathias Wexler Friedman LLP, 50
Fountain Plaza, Suite 1700, Buffalo, New York,
on Wednesday, August 30th, 2017, at 10:03 a.m.
ending at 11:48 a.m., pursuant to notice.

**CERTIFIED COPY**

ATKINSON-BAKER, INC.
COURT REPORTERS
(800) 288-3376
www.depo.com

FILE NO.:    AB095E9

1

David J. Maczka
August 30, 2017

A  P  P  E  A  R  A  N  C  E  S:

ATTORNEYS FOR THE PLAINTIFF:

    SMITHMARCO, P.C.
    BY: LARRY P. SMITH, ESQ.
    (appearing via videoconference)
    55 W. Monroe Street, Suite 1200
    Chicago, Illinois 60603
    (312) 324-3532.

ATTORNEYS FOR THE DEFENDANT:

    LIPPES MATHIAS WEXLER FRIEDMAN LLP
    BY: BRENDAN H. LITTLE, ESQ.
    50 Fountain Plaza, Suite 1700
    Buffalo, New York 14202
    (716) 853-5100.

Atkinson-Baker Court Reporters
www.depo.com

WITNESSES

WITNESS                EXAMINATION                    PAGE

David Maczka      By Mr. L. Smith                4

EXHIBITS

EXHIBIT              DESCRIPTION                     PAGE

(No exhibits marked)

3

Atkinson-Baker Court Reporters
www.depo.com

THE REPORTER: Are you going to have your client read and sign?

MR. LITTLE: Yes.

DAVID J. MACZKA, 357 West Klein Road, Williamsville, New York 14221, having been first duly sworn, was examined and testified as follows:

EXAMINATION

BY MR. SMITH:

Q. Let the record reflect this is the discovery deposition of David Maczka taken pursuant to notice pursuant to the Federal Code of Civil Procedure and applicable local rules for the Northern District of Illinois.

Mr. Maczka, I am going to be asking you some questions in this deposition in the case of Prendergast versus First Choice Assets, LLC. Are you familiar with that case?

A. Yes.

Q. Have you ever been in a deposition before?

A. I have.

Q. Okay. How many times?

A. One -- or two other times.

4

Atkinson-Baker Court Reporters
www.depo.com

Q. And in both of those times were they in any capacity as an employee or worker for First Choice Assets?

A. No, I don't believe.

Q. Were any of them?

A. No.

Q. Okay. So the two times that you were in a deposition had nothing to do with First Choice Assets in any way?

A. That's correct.

Q. Okay. How long ago was the last time you gave a deposition?

A. About a year -- was it about a year and a half?

MR. LITTLE: I can't -- you can't look at me.

A. I can't remember. It's about a year and a half I am guessing.

Q. What kind of case was that?

A. I don't recall.

Q. What were you -- were you a witness, a named witness?

A. I was a witness, yes.

Q. Okay. Did you testify in a courtroom also?

A. No.

5

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q. Okay. Do you remember the name of the case?

A. I don't recall.

Q. Do you remember the party that called you to testify as a witness in the deposition?

A. My attorney actually let me know that I needed to come in for a deposition.

Q. But what was the identity of the party, the plaintiff or defendant's name that named you as a deponent, as a witness?

A. I don't remember. I don't recall.

Q. And you're saying this was just one year ago?

A. About a year and a half ago, yeah.

Q. Okay. And how about the deposition before that, how long ago was that?

A. That was probably about six years ago.

Q. Okay. And do you remember what kind of case that was?

A. It was a whole other company so I don't remember what it was in regards to. I am not trying to be --

Q. The one --

A. -- difficult.

Q. I am sorry. The one you're saying was like --

A. I'm sorry.

Q. I apologize. The one that you're saying that

6

was like a year and a half ago, did that have anything to do with a debt collection case?

A. It did, yes.

Q. Okay. Were you working for First Choice Assets at the time?

A. Yes.

Q. Okay. But First Choice Assets, were they a named party in the lawsuit?

A. I mean, should I explain? I could explain my background in regards to --

Q. Well, I was going to get into your background but I just wanted to know about the deposition you sat in and what kind of witness you were and what kind of case it was is all I am looking for.

A. Well, from a background perspective, I am a compliance officer for two companies so it happened with a different company at the time.

Q. Okay. So anyway, kind of got off-track with how I really wanted to start this.

I am going to ask you some questions regarding this matter Prendergast versus First Choice Assets --

A. Okay.

Q. -- and other questions regarding First Choice

7

Assets.

If you don't understand my question, please tell me. I will rephrase it so that you do. I realize it may be difficult communicating as this is going through a videoconference. So if you don't understand me, you know, let's try to get a good question out to you so that you understand it. I am not trying to trick you here.

A. Okay.

Q. If you need to take a break for any reason, obviously you're welcome to do that. You can't do it when a question is pending. So if the question is pending and you want to take a break, I am going to make you answer that first and then you can take your break.

A. Understood.

Q. Also you and I -- I am asking questions, you're answering, the court reporter is taking down everything that we're saying. And, again, not being in the same room, it could be difficult to identify when I am done talking and asking my question and when you're done answering my question.

So let's do our very best if you can to

Atkinson-Baker Court Reporters
www.depo.com

wait until I am finished with my question before you start answering it, and I will extend the same courtesy to you. I will try to make sure I know you're done answering the question before I move on to my next, that way the court reporter can take down what we say, okay?

A. Okay.

MR. LITTLE: And, Larry, just so you know, we're getting about a second delay from the speaking just so you're aware. I don't know if you're getting it on your end too. I think that's why you guys may be talking over each other a little bit. We're just getting about a second delay on the video feed.

MR. SMITH: I am seeing that and that's why I am kind of mentioning it.

Q. Let's do our very best to take our time going through it, okay?

A. Okay.

Q. All right. So currently you just mentioned you're a compliance officer for two different companies. What two companies?

A. First Choice Assets and Everest Receivable Services.

9

Atkinson-Baker Court Reporters
www.depo.com

Q. Do you have any other occupations currently?

A. I do not.

Q. And what is a compliance officer for both of those companies? What does that mean you do?

A. I handle part of the training process when it comes to compliance, answer any complaints, respond to complaints. I oversee the quality part of the business from call monitoring and any compliance-related issues with the companies.

Q. How long have you been working for First Choice Assets?

A. Four years.

Q. And when you started with them, what did you start as?

A. Compliance officer.

Q. Okay. So you came onto the job as compliance officer?

A. Correct.

Q. Okay. And before that, four years ago, what did you do?

A. I was the director of quality and compliance.

Q. For whom?

A. National Action Financial Services.

Q. How long did you have that position?

10

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

A. About four years.

Q. Okay.  Now, turning to Everest Receivables, how long have you been the compliance officer for them?

A. Four years.

Q. And four years before when you were working as director of quality control for National Action Financial Services, did you -- were you also working at Everest or did you work somewhere else?

A. No, just National Action Financial Services.

Q. Okay.  So when you left National Action, you then went and took on a job as a compliance officer for two separate companies?

A. Correct.

Q. Do you know if those companies have any ownership relation, the two that you work for now?

A. No.

Q. You don't know or there is none?

A. No, there isn't.  Two separate owners.

Q. Where is Everest located?

A. Sonwil Drive.

Q. And where is First Choice located?

A. Sonwil Drive.

11

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q. Are they at the same address?

A. Not the same address, it's a strip mall so they're near -- they're right down the road from each other.

Q. And what is Everest Receivable Services? What kind of business is that?

A. Debt collection.

Q. And both companies know that you work for the other one as a compliance officer?

A. Correct.

Q. Okay. Can you tell us which one that you, if there is one, which one you spend more time with?

A. It's equal amount of time between the two.

Q. Okay. So going back then eight years before you were at National Action Financial Services, what did you do before that?

A. Director of collections.

Q. For whom?

A. Redline Recovery.

Q. And where is Redline Recovery located?

A. In Getzville, New York. They're -- actually, they're no longer in business.

Q. Right. How long did you work there?

A. About a year and a half.

12

Atkinson-Baker Court Reporters
www.depo.com

Q. And for that entire year and a half were you the director of collections?

A. That's correct.

Q. Okay.  So what did you do before that?

A. Worked at -- I was a director of collections at -- well, I had two different.  I started off director of collections at Creditors Interchange and then I moved into a different role handling -- I was the director of operations support.

Q. How long in total in your professional career have you worked in the field of debt collections?

A. Twenty-five years.

Q. And of those 25 years, how long -- how many of those years were you in a managerial position, like a director as you have described?

MR. LITTLE:  Form.

A. About 23 years.

Q. And for the two years otherwise, what was the position that you had?

A. I was just a debt collector.

Q. When you were just a debt collector, who did you do that for?

A. Great Lakes Bureau.

13

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q. Where are they located?

A. They're no longer a business, but they were in Buffalo.

Q. Okay. What is your highest level of education?

A. I have a bachelor's degree.

Q. From where?

A. Hilbert College.

Q. And where is that located?

A. Hamburg, New York.

Q. And what year did you get that?

A. '93.

Q. Okay. Any other post-baccalaureate classes that you have taken in any way?

A. No.

Q. Okay. Do you have any felony convictions?

A. No.

Q. Any convictions of any crime that involves fraud, dishonesty, or theft?

A. No.

Q. First Choice Assets, how many different customers does it currently have?

A. I couldn't -- off the top of my head, I don't have that information in front of me so I don't want to just ballpark a number.

14

Atkinson-Baker Court Reporters
www.depo.com

Q. Yeah, we can ballpark the numbers. I am looking for an estimate. You don't have to give me an exact.

    About how many clients do you think First Choice has?

A. Are you talking -- now, if you can kind of clarify the question a little bit. Are you talking consumer accounts or are you talking clients as far as who they work for?

Q. All clients.

A. All clients, there is one.

Q. Not just consumer accounts, all.

A. Okay, one.

Q. First Choice Assets has one client?

A. Correct.

Q. And who is that client?

A. DNF Associates.

Q. DNF Associates?

A. That's correct.

Q. What does DNF stand for?

A. That I'm not 100 percent sure. That's the initials, DNF.

Q. And are you familiar with any people that work at DNF?

A. Yeah. Just, I mean, the normal people I would

15

Atkinson-Baker Court Reporters
www.depo.com

correspond with if I had any questions, the media team there, things like that.

Q. Who are those people?

A. Bianca Portal handles media. Joe Herman handles outsourcing so I would talk to him in regards to outsourcing accounts to us.

Q. Anybody else?

A. That's about it.

Q. Do you know anybody who is a -- holds the position of chief executive officer for DNF or president?

A. Yeah, I mean, I know the name, Dan Mendez.

Q. Dan Mendez?

A. Yeah.

Q. Okay. Now, a moment ago I asked you how many clients you had and you had a hard time estimating but now you're telling me it's one so I want to make it clear. First Choice Assets has one client called DNF Associates?

A. That's correct.

MR. LITTLE: Form.

A. The only reason I asked for clarification is I wasn't sure if you were asking about how many consumer accounts that we have, as far as how many consumers we would work their contact,

16

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

you know, so that's where I was asking.

Q. We're getting right to that.

A. That's why I was getting clarification.

Q. We're getting right to that. But I want to -- before I get to that, I want to finish exploring this DNF. Do you know what kind of business they are?

A. They're debt buyers.

Q. Okay. Do you know from where? What companies they buy debts from?

A. I mean, I don't know all of who they purchase, you know, accounts from. I mean, I know accounts that we have that we work for them.

Q. Okay. Do they refer a specific kind of account to you or do they refer everything?

A. Yeah, I don't know how much or exactly everything that they have but, you know, we get Sterling Jeweler accounts from them. There is some Santander Auto so, I mean, I am not really sure how many other different types of paper they purchase.

Q. Okay. Now, how many -- you might not know the exact number but about how many consumer clients -- or, I am sorry, consumer accounts does First Choice Assets collect on?

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

A. I would say, you know -- like I said, I would have to ballpark the answer. I don't know specifics. So if I was to hazard a guess or even, you know, somewhere between, you know, total accounts they have in their inventory somewhere around maybe 15- to 20,000 accounts.

Q. Okay. Now, do you have any knowledge of any statistics of what the average account balance is?

A. I don't.

Q. Is it something that's kept anywhere with First Choice Assets, those kind of statistics of data?

A. Yeah. I mean, the manager would have that information I am sure, you know, something I can look up in the system and get a better idea of what the average balance was.

Q. That's something that you could look up in the system?

A. I would be able to see. I can, you know, get an idea of the average balance.

Q. Have you ever done that before?

A. No, not in my capacity. Not in my capacity.

Q. In any other capacity? Have you ever seen what the average balance is?

18

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

A. Not for this company, no.  I am saying as far as, you know, when I was director of collections, things like that, that's information that I would obviously, you know, be privy to that information, knowing that.  As far as a compliance officer, I just handle the compliance piece.

Q. Okay.  Does First Choice Assets handle non-consumer accounts too?

A. No.

Q. So everything is all consumer-based debts?

A. That's correct.

Q. Okay.  How many employees does First Choice Assets have?

A. About 28.

Q. And how many of those 28 are collectors?

A. Twenty-three.

Q. And what are the other five?

A. Two managers that oversee the floor and then there is three team leads.

Q. Who are the two managers that oversee the floor?

A. Tim Smith and Rhonda Reiter.

Q. Okay.  And when you say they oversee the floor, could you describe what their job is,

Atkinson-Baker Court Reporters
www.depo.com

what they're supposed to do?

A. I mean, it's debt collection so they're obviously making sure -- you know, they will be listening to calls along with the team leads, you know, setting up different types of accounts of what they're going to work that day, just overseeing general operations of the collection floor.

Q. Do they listen in on calls?

A. Yes, they do.

Q. When they listen in on calls, do they have the capability of listening to it so that they can hear the consumer on the other line too?

A. Yes.

Q. So there is a system that does that, that they can plug into?

A. That's correct.

Q. What's that system called?

A. The system is LiveVox.

Q. Are you aware of what the net income was for First Choice Assets over the last few years?

A. I don't -- I do not.

Q. Has it ever been something that's come to your attention, the value of it?

A. No.

20

Q. Okay. Are you a salary-based employee or are you commission based?

A. Salary based.

Q. 100 percent salary?

A. Yes.

Q. Okay. How about the collectors? Are they salary based, commission based, or both?

A. They have an hourly rate and then they get a bonus based on how much money they collect.

Q. Okay. All right. Now, in this case, Prendergast versus First Choice Assets, you were called upon to answer some written discovery. Do you remember that?

A. Yes.

Q. Okay. And do you remember seeing the written discovery that you answered?

A. I do.

Q. And do you remember that you signed that discovery under oath?

A. I do.

Q. Okay. And do you recall it's pretty much the same oath that you took when you sat here today, right?

A. That's correct.

Q. And so you knew you had to tell the truth when

21

you answered this discovery, correct?

A. Yes, sir.

Q. Do you remember what discovery requests you saw? What they were?

A. I mean, I'd have to look but, I mean, I don't remember offhand every question that was asked.

Q. I understand. But you remember one of the documents being interrogatories, correct?

A. Correct.

Q. And that was the thing that you signed under oath, right?

A. Correct.

Q. Okay. And in that you recall -- you may recall that you answered that you were the person that provided the information to answer this discovery. Do you remember that?

A. Yep, correct.

Q. Was there anybody else at First Choice Assets that provided you information to allow you to answer the discovery?

A. No.

Q. Okay. Now, another one of the documents that we sent to be answered was a document called Request for Admissions. Do you recall seeing

22

Atkinson-Baker Court Reporters
www.depo.com

that?

A. Yes.

Q. Okay. Now, I understand that you didn't sign that particular document under oath but was that a document that you looked at and assisted with answering?

A. Yes.

Q. Okay. And you saw your answers to those questions?

A. I did.

Q. Okay. What I would like to do is have you pull out what we have marked as Exhibit 1 and sent it to you.

Do you recognize that?

A. Yes, I do.

Q. And that is the Request for Admissions, your responses to it?

A. That is correct.

Q. Okay. And you assisted in helping provide these answers, correct?

A. I did.

Q. Okay. Now, looking at these responses, the second request we asked was one of the obligation allegedly owed by Plaintiff, Ms. Prendergast, to Defendant, you, attempted

23

Atkinson-Baker Court Reporters
www.depo.com

to collect is a "debt" defined by 15 U.S.C. 1692a(5).  Do you see that?

MR. LITTLE:  Form.

A.  I do.

Q.  And are you familiar with that legal citation, 1592 -- 15 U.S.C. 1692a(5)?

A.  Can you repeat the question?  I apologize.

Q.  Are you familiar with that statute, that citation that I provided?

A.  I mean, I know of it.  But in regards to the actual understanding of the definition, that's why I defer those things to our attorney.

Q.  Understood.  You're familiar with the Fair Debt Collection Practices Act, right?

A.  Correct.

Q.  The company First Choice Assets, LLC, is a debt collector, correct?

A.  That's what we do, correct.  We collect debts.

Q.  You collect debts that are sent to you by DNF Associates, right?

A.  Yes.

Q.  Now, when you collect the debts, First Choice collects the debts, First Choice doesn't own the debts they collect, do they?

A.  No, they do not.

24

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q. DNF Associates owns all the debts that First Choice Assets collects?

A. That's correct.

Q. So First Choice Assets is always collecting a debt that's owed or alleged to be owed to another company, right?

A. Correct.

Q. Okay. If you could pull out what I have sent over as Exhibit 5.

A. Okay, I have that.

Q. Okay. Do you recognize the text of what that is?

A. I do.

Q. That's a portion of the Fair Debt Collection Practices Act, right?

A. Correct.

Q. Now, do you believe that First Choice Assets has to comply with the first -- with the Fair Debt Collection Practices Act?

MR. LITTLE: Form.

A. I do.

Q. Why do you think First Choice Assets has to comply with the Fair Debt Collection Practices Act?

MR. LITTLE: Object to the form.

25

David J. Maczka
August 30, 2017

A. You know, it's just like it's a written law so we're expected to follow the laws as written.

Q. Is it a law that you believe applies to First Choice Assets' business?

MR. LITTLE: Object to the form.

A. I do.

Q. Okay. Now, looking at Exhibit 5 -- well, strike that.

Before I do that, do you train your employees on the Fair Debt Collection Practices Act?

MR. LITTLE: Object to the form.

A. I train them on a portion of it and then we also use the American Collectors Association FDCPA. It's about a two and a half hour DVD that they go through and then they complete the test and that's -- they have to pass the test to be a collector and they take that biannually every January and June.

Q. So employees are otherwise trained on the Fair Debt Collection Practices Act and how to comply with it?

A. Correct.

Q. Right?

A. Correct.

26

Q. Now, looking at Exhibit 5, this is Section
1692a, it's the definitions.  And if you look
at 5, (5), that starts with "the term debt
means".

A. Mhmm.

Q. Do you see that?

A. Yes.

Q. Take a moment to read that.  Can you take a
moment to read that?

A. Yes.

Q. Tell me when you're done.

A. Okay, I am done.

Q. Okay.  So that is the definition of what a
debt is under the Fair Debt Collection
Practices Act, right?

A. Correct.

Q. Okay.  Now, in Exhibit 1 we asked you if the
obligation allegedly owed by Ms. Prendergast
was a debt as defined by what you just read.
You denied that.  Do you see that?

A. I do.

Q. Why do you deny that the debt that the
defendant, First Choice, was attempting to
collect was not a debt under this definition?
Why do you answer that?

27

A. Well, the question asked if it was owed by the plaintiff. And as we have discussed, as we have answered the questions, we were not sure if this was the correct Yenma Prendergast. We never identified who we were speaking with.

Q. Let's look at Exhibit 1 number 2 again. Let's make sure that you understand what's being asked of you.

The obligation allegedly owed by Plaintiff that Defendant has attempted to collect is a debt defined by 1692a(5). So without regard to whether or not you were actually speaking with her --

A. Mhmm.

Q. -- you had a debt that you were attempting to collect from her; is that correct?

A. Well, we were attempting to first as we start out gain location information, gain the address of Yenma Prendergast, and then we would have discussed, you know, what we were calling about if we could identify who we were speaking with.

Q. So when that phone -- when those phone calls were made, why were those phone calls made?

A. In an attempt to speak to Yenma Prendergast

28

David J. Maczka
August 30, 2017

and --

Q. And if Yenma Prendergast -- sorry, I apologize. Continue to say what you were going to say.

A. That's okay. And if we would have identified her at that point, first obviously we're looking to confirm the address to send the letter, the G notice to the consumer, that's first and foremost. And then we would have -- if we would have identified who we were speaking with, we would have went further in regards to what we were calling about.

Q. And what were you calling about?

A. An outstanding obligation that was owed.

Q. So when you -- when First Choice Assets collectors called that number that they had to call, if they had reached Ms. Prendergast, knowingly reached Ms. Prendergast, they were going to attempt to try to discuss collecting that debt from her?

A. Discuss the account the -- the account in the office, yes.

Q. Okay. And the account in the office is an account that First Choice is attempting to collect, correct?

29

Atkinson-Baker Court Reporters
www.depo.com

A. Correct.

Q. And so if you would have reached her, you would have been collecting that debt, correct?

A. We would have attempted to collect, correct.

Q. Okay, okay. So going back to number 2, the obligation allegedly owed by Plaintiff that Defendant attempted to collect is a debt. We want to know whether or not you concede that what you were calling her about was a debt as defined by the Fair Debt Collection Practices.

MR. LITTLE: Object to the form.

A. Well, I mean, again, as I said prior, and again I am not trying to be difficult, as far as the definitions are concerned, you know, those are the things that I lean on our attorney for to define and better explain. I am not an expert. I am not an attorney.

Q. Let me ask it this way. Forgetting the communication part, the debt itself that First Choice Assets had in Ms. Prendergast's name, was it a consumer debt as defined by the FDCPA?

MR. LITTLE: Object to the form.

Q. Was the kind of debt a consumer debt?

MR. LITTLE: Object to the form.

Atkinson-Baker Court Reporters
www.depo.com

A. Again, you know, as far as the definition of the term debt, you know, like, again, I am not trying to be difficult but, you know, when it comes to definitions and really understanding the definition, that's why we have our attorney to really understand and define what that definition is.

Q. Yeah but you provided answers and you denied that this was a consumer debt.

A. Well --

Q. So I just want to kind of see if we can get an agreement on the record that --

A. Well --

Q. Let me finish.

A. Okay.

Q. I want to see if we can get an agreement on the record that the account that you were trying to collect from her that you were going to eventually attempt to collect from her if you ever supposedly spoke to her, get to that, was a consumer debt? So let's ask those questions.

Who was the creditor, original creditor for the account?

A. I believe it was J.B. Robinson.

31

Atkinson-Baker Court Reporters
www.depo.com

Q. And what is J.B. Robinson?

A. A jewelry store.

Q. Okay. Now, earlier we spoke and I asked whether or not you collect any other kind of debts besides consumer debts and you said no, right?

A. Correct.

Q. So the only kind of debts First Choice Assets calls people on are consumer debts, right?

A. Correct.

Q. So it wasn't a business debt that you were collecting from Ms. Prendergast, right?

A. That's correct.

Q. It wasn't a municipal fine, correct?

A. That's correct.

Q. It wasn't a subrogation claim, correct?

A. Correct.

Q. It was for her purchasing something personally for herself, right?

        MR. LITTLE:  Form.

A. Again, Yenma Prendergast, yes.  In regards to what we're discussing, again, we weren't sure we were talking to the correct Yenma Prendergast that owed that debt.

Q. I am not talking about who you're talking to.

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

I am talking about whether or not the particular debt you were attempting to collect or going to attempt to collect would be classified as a consumer debt --

A. It's a consumer --

Q. -- such that First Choice Assets would collect it?

A. Consumer account, correct.

Q. Okay. Moving on. Number 3 of the request for admissions we ask you whether First Choice Assets is a debt collector as defined by 1692(6). You denied that. Why did you deny that?

A. Similar to what we talked about a little bit earlier as far as the definition, you know, those are questions I refer to our attorney in regards to the actual definition itself. I am not an attorney so to actually answer the question in regards to the law and 15 U.S.C., you know, I am not an attorney.

Q. You have employees that you call collectors, right?

A. Collection associates, correct.

Q. Okay. Those collection associates are attempting to recover money from people who

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

allegedly owe money to DNF Associates, right?

A. Okay, correct.

Q. First Choice Assets uses mail as one of the ways of collecting these debts, correct?

A. Correct.

Q. Also uses telephones?

A. Yes.

Q. Okay. Any other instrumentalities besides the mail and the phones that are used to collect the debts?

A. No.

Q. Okay. Aside from collecting these consumer debts, does First Choice Assets do anything else for income?

A. They do not.

Q. Okay. So the primary business of First Choice Assets is the collection of consumer debts, right?

MR. LITTLE: Object to the form.

A. They call and collect on accounts, correct.
Again, I will refer back to the actual, you know, trying to define the actual definition. Yes, I can read it. I can -- you know, layman terms I can read it, understand it. But, again, that's why we have, you know,

34

an attorney that can define that better for us and we lean on that attorney to help us out.

Q. But First Choice Assets is a debt collection company, right?

MR. LITTLE: Form.

A. Well, they call on -- they call consumers to collect on outstanding obligations.

Q. And those outstanding obligations are all consumer debts?

A. Money is owed, correct.

Q. Okay. One sec, sorry.

On Exhibit 1 if you can go to number 22.

A. Okay.

Q. We made the statement asking you to admit or deny that on December 2, as of that date, December 2, 2016, Defendant, First Choice Assets, was aware of Plaintiff's residential address and you denied that. Do you see that?

A. I see that.

Q. Okay. Why were you not aware of her residential address?

A. In documentation that we had there was two different addresses that were supplied.

Q. Okay. And was one listed as recent and one listed as old?

35

Atkinson-Baker Court Reporters
www.depo.com

A. One was not listed as recent or old. The original application has one address and then some of the other documentation has a different address.

Q. That brings up a good point. When First Choice Assets obtains files or obtains accounts to collect from its clients, I am going to remember this, DNF Associates, what information does DNF give First Choice Assets to begin collecting these debts?

A. They supply addresses, phone numbers, the consumer's name, sometimes social security number in regards to the consumer. That's what they provide, yes.

Q. How is that given? Is it just digitally sent to you?

A. Yeah, it's sent -- it's sent via FTP and then the accounts are loaded into the system.

Q. It's sent by whom?

A. DNF.

Q. Okay, I am sorry, I thought you used three different letters.

A. Oh, sorry, FTP. They're sent over -- they're sent to us via secure FTP and that data is loaded into the system.

36

Q. Could you tell me what FTP is?

MR. LITTLE: I believe it stands for file transfer portal.

A. File transfer protocol or portal.

Q. So what's being sent to you is digital information?

A. Correct.

Q. Right?

A. Mhmm.

Q. Not documents?

A. No, we just get the account information originally.

Q. And that account information then gets uploaded into your system?

A. That's correct.

Q. Okay. Do you know who is on the other end sending you the account information?

A. I mean, I don't know the information. I have nothing to do with that part so I'm not sure who or how they get that information.

Q. You don't know who over at DNF is sending it?

A. Their MIS manager sends it over. I don't know the person's -- offhand I don't know the person's name.

Q. Who receives it for First Choice Assets?

A.  Anna Burkard.

Q.  So what is her title?

A.  MIS manager.

Q.  What does MIS stand for?

A.  Manager information systems.

Q.  Okay.  And her job is to take this information digitally and upload it into the system?

A.  That's correct.

Q.  So your client did give you a residential address, right?

A.  They gave us addresses, correct.

Q.  Whatever addresses you were given you uploaded into the system, right?

A.  Correct.

Q.  And -- okay.  Let's go to what's been marked as Exhibit 4.  Do you see that?

A.  I do.

Q.  Can you identify what this is?

A.  Those are screenshots from our system.

Q.  Is this the system that you were talking about that gets uploaded with the information that comes from your client, DNF?

A.  That's correct.

Q.  All right.  And this is the stuff that gets uploaded by that woman whose name you just

38

Atkinson-Baker Court Reporters
www.depo.com

gave me that I forgot?

A. Anna Burkard, that's correct.

Q. All right.  So Ms. Burkard is responsible for getting information and putting it into the system, right?

A. Correct.

Q. Is this the only system you have for collection data?

A. Yes, it is.

Q. Okay.  So it wouldn't be located anywhere else?

A. Not that I know of, no.

Q. Okay.  So looking at the screenshots here, is there a section that shows on the top an address?

A. It does.

Q. Okay.  I see a section toward the top left where there is a last four digits of the social security number and then under that an address.  Do you see that?

A. Yes, I do.

Q. And that address says 11134 South Avenue E, correct?

A. Correct.

Q. And that's Chicago, Illinois?

39

Atkinson-Baker Court Reporters
www.depo.com

A. I believe that's what it says. It's a little blurry but I believe that's what it says.

Q. Okay. Now, this would be the address that was given to you by your client?

A. That's correct.

Q. Okay. Now, at the bottom of that, what appears to be that screenshot, and correct me if I am wrong, I think I am looking at two different screenshots on this exhibit, right?

A. Mhmm, yes.

Q. The top appears to be one page of the system and the bottom is another, right?

A. Correct.

Q. We will get more into that stuff later. We have plenty of time. But when I get to the bottom of the top screenshot, there appears to be an entry for what's called an old address, right?

A. I believe so.

Q. And in that old address box appears the same 11134 South Avenue E, Chicago, Illinois, right?

A. It looks -- like I said, I apologize, it's a little blurry. It looks like that. I can't really tell.

40

Atkinson-Baker Court Reporters
www.depo.com

Q. Well, if we need, we can take a break and you can go pull up the actual one so we can confirm that these are the two correct addresses. Do you need to do that?

MR. LITTLE: Well, this is your deposition so whatever exhibits you want to present to him, you can do that.

MR. SMITH: These are his exhibits. And if they're not clear, that's unfortunate but I want to make sure that he can testify that those addresses there are both the same.

MR. LITTLE: Well, Larry, you asked for a clearer version. I provided you with a clearer version so I gave you what I have so I don't have anything other than what I produced to you.

MR. SMITH: Okay, all right.

BY MR. SMITH:

Q. Let me ask you this, Mr. Maczka, do you see any other addresses for Ms. Prendergast on this exhibit?

A. Not that I can see on this.

Q. Okay. So you mentioned before that you had multiple addresses for her, where are they?

41

David J. Maczka
August 30, 2017

A. Well, we also get the documentation behind it. So we get, you know, the screenshots from J.B. Robinson. We get the original application. So if you look at those --

Q. I asked you that before. I am sorry, I asked you that before what you get when these accounts come in and you said digital information. Are you telling me that there is more things that you get when the accounts come in?

A. Well, again, specific to the question, you were asking in regards to the accounts and how they're sent to us. Maybe I misunderstood the question in regards to you know, but we were talking specifically about account information and that's how I answered the question.

Q. Okay. Well, what the original question we started with was whether defendant was aware on December 2nd what plaintiff's residential address was and you denied that. So I am trying to get to the bottom of that as to why you denied knowing her address on December 2nd.

The screenshot I am looking at on Exhibit 4, is that what this screenshot would

42

Atkinson-Baker Court Reporters
www.depo.com

have looked like on December 2nd?

A. Correct. There is an address there, correct. Do I 100 percent --

Q. There's --

A. Do I 100 percent know that's the correct address? No, I don't.

Q. You don't know if 100 percent but that was the address your client provided, right?

A. Correct.

Q. And your client provided no other addresses at that time, correct?

A. For the actual uploading of the accounts, I can't answer -- I mean, I can't answer that because I don't load the accounts so I am not 100 percent sure.

Q. Let me ask you this: Does First Choice Assets make it a practice to call every single debtor to confirm that the address they have in their system is the correct one?

A. That's their practice, correct.

Q. Every single one they call to make sure it's the correct address?

A. That's correct.

Q. Is that always done before it sends its initial collection notice out?

43

Atkinson-Baker Court Reporters
www.depo.com

A. That is correct.

Q. Is that because you don't trust your client to have the correct address?

A. I don't know if it's necessarily don't trust. The reality is have we had old addresses, wrong addresses, incomplete addresses, yes.

Q. Okay.  Is that something that's happened on a frequent enough basis that you have made this policy to check addresses before mailing letters?

A. I mean, I don't know if you would call it frequent but it's a situation that have we had wrong addresses, yes.

Q. If you could turn to that same Exhibit 1, request number 29.

A. Okay.

Q. We asked you Defendant, First Choice Assets, performed no other investigation into the -- into Ms. Prendergast's location information between December 2 of 2016 and December 6.  Do you see that?

A. I do.

Q. We asked you to admit or deny whether you performed no other investigation in that four-day period.  You denied it.  Do you see

44

Atkinson-Baker Court Reporters
www.depo.com

that?

A. Correct.

Q. So you're saying between December 2 and December 6 there was some investigation performed into her location information?

A. No, there was no other investigation into that information.

Q. So that -- you would admit that. There was no other investigation, correct? Maybe you misspoke on that one. Do you want to reread it?

A. Yeah, maybe I -- I would assume I misunderstood it.

Q. It's okay if it's misunderstood. I just want to get clarification on it. If you want to tell me you misunderstood it and you meant to admit it, that's perfectly fine.

A. Yeah, I don't think we performed any other investigation.

Q. Okay. Turn to number 35 in this exhibit.

In this one we ask in the initial telephone conversation with Ms. Prendergast First Choice Assets never stated that unless Ms. Prendergast within 30 days disputes owing the debt Defendant will assume the debt is

45

Atkinson-Baker Court Reporters
www.depo.com

valid and you denied that.  Do you see that?

A. Mhmm.

Q. Okay.  In that you're saying that in your first conversation with Ms. Prendergast they did provide that notification?

MR. LITTLE:  Object to the form.

A. Well, the problem is we never validated any conversation that we were talking to the actual plaintiff.

Q. Okay.  So for that reason you're denying that you -- in other words -- let me ask you this: The person that you spoke with or that First Choice Assets spoke with when they called Ms. Prendergast, and we will get into those calls --

A. Mhmm.

Q. -- those people didn't make any disclosure of the consumer's rights under the Fair Debt Collection Practices Act, right?

A. They wouldn't have because they didn't know who they were speaking with.

Q. Okay.  When your collectors called the number to call Ms. Prendergast, let's go into that really quick.

Looking at Exhibit 4.  Can you identify

46

what number they called to locate
Ms. Prendergast?

A. I mean, I can only assume -- well, I see a
number. It's a little blurry, but I think it
starts with 733 and I don't -- because I am
looking at the bottom piece trying to see the
number.

Q. Maybe if you could maybe look -- maybe we can
just agree on the last four digits of the
phone number is 0882. Can you see that?

A. It's blurry. I don't want to mislead you and
say I agree or I don't agree. It's kind of
blurry so I can't --

Q. Okay. The number that was called, was that
given to you by your client?

A. I can't answer that. I am not sure. I don't
have the original file in front of me. I can
assume, but I can't answer that affirmatively.

Q. How else would you have gotten the phone
number?

A. You know, we do some skip -- not the
collectors themselves, but we do scrub the
accounts for deceased, try to see if there are
other phone numbers, possible addresses,
things like that. So there is some upfront

47

Atkinson-Baker Court Reporters
www.depo.com

        waterfall skip tracing that's done.

Q. Okay.

A. But not by the agents themselves.

Q. Are you able to see better the phone number in the top screenshot? There is a listing of phone numbers in the top screenshot, and it looks like there is one that says best. Do you see that?

A. Yep.

Q. Okay. What does best mean?

A. You know, what could be the best number to contact the person at.

Q. All right. But as you sit here and look at this, you don't know how you got that number?

A. I can't answer affirmatively how we received it.

Q. How would you be -- would you be able to? What would you need to look at to find out how you got that number?

A. I would have to look at the original file that came over to see what numbers were presented.

Q. The original file comes over digitally, right?

A. Correct, correct.

Q. And then it's uploaded into the system by Ms. Burkard, right?

48

A. Mhmm, correct.

Q. Okay. So -- and then this is how it would appear is on Exhibit 4, right?

A. Well, it would appear with the information, correct, but I can't affirmatively answer the question where that phone number came from at this time.

Q. If Ms. Burkard or anybody else at First Choice Assets would have scrubbed this account for a different phone number, would that event of scrubbing it appear anywhere in the account notes?

A. It would not.

Q. So it's something that would happen on the side without anybody knowing where the number came from?

A. Correct.

Q. Okay. So the phone number that's in best, can you see that clearly?

A. I mean, I can make out some of the digits.

Q. Could you make out the last four?

A. I see a zero. I see a three. There could be an eight. I know we talked about earlier it could be 0883, but I am not -- I can't be 100 percent positive.

49

Atkinson-Baker Court Reporters
www.depo.com

Q. Maybe you and I are both getting to the age we need our readers.

A. Well, off topic, it's funny you mention that because I have been talking to my wife because my vision is kind of going on me as I am -- that's why I am pulling it further away to try to get a clearer vision so I apologize.

Q. No, I get it. I am kind of there. I refuse though. Let me ask you this, getting back on track.

A. Okay.

Q. When your collectors called the number that was in the system to call for Ms. Prendergast --

A. Yes.

Q. -- who were they supposed to be calling?

A. Well, they're calling a phone number to try and reach the consumer, Yenma Prendergast.

Q. And it's a phone number that First Choice Assets from its investigation or from its client believes is the number of Ms. Prendergast, right?

A. It could be a possible number, correct.

Q. I understand phone numbers change --

A. Yep.

50

Q. -- and that people move, people change their numbers. But when you first get a phone number, however you get it and put it in best and tell your collectors to call that number and they do, are the collectors expecting or hoping to reach the actual consumer?

A. Hoping to I guess, yes.

Q. If you're unable to obtain the phone number of the consumer, what do you do?

A. If there is no numbers on the account; is that what you're saying?

Q. Yeah.

A. There is no phone calls being made to anybody then.

Q. Okay. Would there be an indication on the file or on this Exhibit 4 that the number that you have may be a third-party number rather than a direct call to the consumer? Would that be on there?

A. I mean, that phone number is, like you said, the best slot. But if there is other numbers, they could -- they can put them in different slots on the account.

Q. Okay. So when they called this particular number, the expectation was that they were

51

calling a number that belonged to Ms. Prendergast and they would reach her?

A. I won't necessarily say that's a true statement. Well, they're calling a phone number that's there and trying to confirm who they're speaking with, yeah, with the hopes that they reach the right person.

Q. Do you know if the collectors believe that the number they were calling was potentially a third-party number?

MR. LITTLE: Object to the form.

A. The reality is that's how the training -- that's how we train it so, you know, there is no -- until they actually confirm that that's the correct number, and there is policy behind that in terms of how do we confirm that we're speaking to the right person, they wouldn't know if that's the correct number or not.

Q. There were two voice recordings of Ms. -- of the phone calls that are the subject of this case, right?

A. Correct.

Q. Okay. And you listened to those recordings?

A. I did.

Q. How many times?

52

Atkinson-Baker Court Reporters
www.depo.com

A. A couple.

Q. More than two?

A. Probably two or three times.

Q. When was the last time you listened to them?

A. Today actually.

Q. This morning before the dep?

A. That's correct.

Q. And when was the last time before today?

A. Probably a couple weeks ago.

Q. Okay. And then when was the first time you listened to it?

A. When we received the lawsuit. That's one of the things I do whenever we receive a lawsuit. I pull all the call information, the call notes, gathering information.

Q. So we know at least three times you have listened to it, right?

A. Correct.

Q. Possibly more than that?

A. I want to say at least three times.

Q. Okay. Now, you have listened to it at least three times including this morning. As you sit here today, do you believe the woman who answered the calls whose voice you heard was Yenma Prendergast?

53

Atkinson-Baker Court Reporters
www.depo.com

MR. LITTLE: Object to the form.

A. To be honest with you, I can't confirm whether that was her or not. I have no idea.

Q. After listening to both calls this morning, you are still not convinced that that was Yenma Prendergast who answered the phone?

MR. LITTLE: Object to the form.

A. That's correct. I don't know who was -- it was a woman's voice on the phone. I don't -- I can't confirm or deny whether it was her or not.

Q. Well, you listened this morning. Didn't you hear her on the second call saying "this is Yenma"?

A. I did but it was after several times of trying to get an idea of who we were speaking with. It sounded kind of nonchalantly like "yeah, this is Yenma."

Q. So she said she was Yenma in the call, right?

A. Correct, mhmm.

Q. And you believe it's possible she was being an imposter and lying about who she was?

A. It's happened several times on calls, many times where people have said who they are.

Q. I am asking you -- I am not asking about

54

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

several calls and other calls.

A. Okay.

Q. I am asking about this call that you listened to this morning. Did you believe that the woman who answered the phone and said "this is Yenma" was lying and she really wasn't?

MR. LITTLE: Objection to the form. Object to the form.

A. I can't -- I am not going to state whether I think she was lying or not. The way she said -- after several questions and trying to get information to confirm who we were speaking with, that's when she said "yeah, this is Yenma" so --

Q. I am asking you --

A. -- am I calling Yenma a liar? No, but I can't confirm whether it is her or not just by the nonchalant statement of "this is Yenma." I can't confirm that's exactly the person I need to speak to.

Q. Mr. Maczka, the woman said "this is Yenma." Either it is Yenma or it is not. Which is it that you believe?

MR. LITTLE: Object to the form.

A. Do I believe her name was Yenma? Well, she

55

David J. Maczka
August 30, 2017

said.  But do we know if it was Yenma Prendergast?  Do we know if it was Yenma?  I mean, all she said was "yeah, this is Yenma."

Q. And --

A. If you're asking me a question in regards --

Q. Sorry.

A. So if you're asking me a question in regards to was the person on the phone's name, did they say "this is Yenma"?  I agree to that.

Do I know if this was the plaintiff?  I have no idea.  I can't answer that.

Q. So you think it is possible that when you were given the account for Yenma Prendergast with one phone number to call and one address and you called that number and the person said "this is Yenma", you believe it's possible still that this was a different person named Yenma and not Yenma Prendergast?

MR. LITTLE:  Object to the form.

A. Until I can confirm based on what our expectations are and our policies, I don't know who I am speaking with until they confirm who exactly it is.

Q. Not who you're speaking with.  You listened to the recordings.  You didn't speak with her,

56

Atkinson-Baker Court Reporters
www.depo.com

right?

A. I didn't, no.

Q. No.  Listening to the recordings, knowing what you know today about this account, looking at these documents and hearing her this morning, are you still of the belief that that might not have been Yenma Prendergast that was called?

MR. LITTLE:  Object to the form.

A. Again, to me, it's two different questions. You're asking, you know, the reason why this whole situation happened is the questions in regards to, you know, we didn't speak -- we couldn't confirm who we were speaking with. So the reality is, I mean, I can listen to recordings.  Can I confirm that that's a real Yenma Prendergast, your plaintiff?  I have no idea.

Q. That's what I am trying to get at.  You're saying as you sit here today you still have no idea whether that woman who answered the phone in those recordings was the debtor you're looking for?

A. That's correct, I have no idea.

Q. To this day you still believe that?

57

MR. LITTLE: Larry, you have asked it seven times. He says he doesn't know.

MR. SMITH: I am trying to make it clear.

MR. LITTLE: It's clear. He doesn't know.

MR. SMITH: I don't feel like the answer has come through very clear, and I am trying to ask a question in a way that will explore his answer in a clearer way, okay?

Give me one second, please.

MR. LITTLE: Take your time.

MR. SMITH: Thanks.

THE WITNESS: Can we take a quick break?

MR. LITTLE: Sure.

Larry, can we take a quick break?

MR. SMITH: Sure. How long do you need?

MR. LITTLE: Five minutes.

(A short recess was taken.)

BY MR. SMITH:

Q. Let's start with picking up Exhibit 4, okay.

A. Okay.

Q. Now, these are two screenshots from your collections system?

58

A. That's correct.

Q. What's the name of the system?

A. FileMaker.

Q. And I think we discussed before, this exhibit appears to have two different screenshots, right?

A. That's correct.

Q. And are these -- because they're like two different applications of the program?

A. Yeah.  So the top screen is the actual front screen that the -- as you pull up the account, that's what you see.  And the second piece is the actual call notes.  If you see the little box down below, you would click on those call notes and that's how you get to that second screen.

Q. You called the first screen a what screen?

A. The primary screen.

Q. Okay.  But you used some other terminology a moment ago, I don't think I heard it.

A. Maybe the main screen.  I don't remember exactly what I said, but that's the main screen.  So when you pull up the account, that's what you will see is that screen first.

Q. All right.  So in that screen when you pull up

59

Atkinson-Baker Court Reporters
www.depo.com

that account, the top one, it has the account

information on it?

A. Yes.

Q. Okay. And the top bit of data there is a --
it says file number. Do you see that?

A. Yes.

Q. Okay. And does that mean file number that's
assigned by First Choice Assets?

A. That's correct.

Q. Okay. And then next to that it says it looks
to say agent and then the box is filled
manager. What does that mean?

A. Every time -- well, as you obviously if you --
just to kind of reiterate, you see status is
cease-lawsuit. Any time we receive a
complaint or a lawsuit and there may have been
a collector's name in that agent's spot, I
automatically move it to manager so --

Q. So that's --

A. -- the collectors can't pull the account up
anymore. I apologize.

Q. Okay. So that spot agent is reserved for who
the collection agent on the file is?

A. Correct.

Q. All right. And then the line below it starts

60

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

    with her last name Prendergast, right?

A. Correct.

Q. And then under that is her first name, right?

A. Correct.

Q. And that comes from the data file that is sent over from your client?

A. Correct.

Q. Okay.  And then you said status, you wrote -- you said cease lawsuit is put in there?

A. That's correct.

Q. And what does that status mean?

A. That's a status that I utilize so once we receive a lawsuit I will change the status to cease -- that's something I input in the status is cease-lawsuit.

Q. Okay.  And then along the next status line -- data field is the data field for last call date.  Do you see that?

A. Correct.

Q. And does that fill in the date of the last phone call made to her, the client, the debtor?

A. I believe it does.

Q. Is that something that automatically fills in, or is that something that the collector has to

61

Atkinson-Baker Court Reporters
www.depo.com

put in themselves?

A. I believe it's automatically put in there, I believe. I am not 100 percent certain.

Q. Okay. Now, there is also along those lines towards the right side a little bit there is a data portion that says fee paid and it looks to say 60 percent and 30 percent. What does that mean?

A. Fee paid 60 percent is whatever the collector collects on it would get 60 percent.

Q. The collector gets 60 percent of any money collected on the account?

A. Correct.

Q. So what does the 30 percent mean?

A. That I am not 100 percent certain.

Q. Okay. Then on the -- going back underneath the portion where it shows her first and last name on the left.

A. Okay.

Q. We kind of touched upon this before, but that appears to be more information about Ms. Prendergast, right?

A. Correct.

Q. It has a box for her social security number and there is just four digits in there. Do

62

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

you see that?

A. Correct, yes.

Q. And where did that information come from?

A. That came over on the file.

Q. Okay.

A. I believe.

Q. And does First Choice Assets get the entire social or just the portion of it?

A. They get the entire social.

Q. And if a collector is calling this person and wants to confirm their social, where do they see the entire one?

A. If you look on the notes section page, that box that's in on the right-hand side there, that's the full social.

Q. Right-hand side on the second page?

A. Yeah, on the second screen there. If you look, there is a box there that has a set of digits, that's the full social.

Q. Why do you put that there?

A. In case -- it's only there in case they need to use the first five. We don't put them on the front screen because we obviously train them to only have the consumer provide the last four so that's what we provide that's on

63

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

the front screen for the consumer because that's the first screen that pops up. So in order to go through the call and identify who they're speaking with, that's why it's only the first four on the front.

Q. Okay. Now, over on the right side of the page of the top screen, there are boxes in the middle and I am pointing to a spot -- a shaded area where it's big, capital, bold the letters B-A-D, bad. Do you see that?

A. Where it says bad phone numbers, is that what you're pointing to?

Q. I was going to ask you. All I see is bad. Are you saying that's bad phone numbers?

A. That's correct.

Q. Okay. And in there is a phone number, right?

A. Correct.

Q. And, I mean, we had a hard time looking at this but it appears to be a different phone number than the ones we had discussed before that was dialed to get to who we hoped was Ms. Prendergast, right?

A. It appears to be, yes.

Q. Okay. How does that information appear in there, in that section?

64

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

A. It can appear in multiple ways. So in the original file if for some reason it's identified from the client that maybe somebody else worked the account and they send us over, you know, if there was any bad numbers, that may have been maybe utilized in another agency.

It's for us so that when we scrub it, we can identify that was a bad number, then obviously we wouldn't call that. Or if we actually called that phone number and somebody said "no, you have the wrong number" then it gets moved to the bad number slots. So it's one of two ways. I can't tell by this account though.

Q. Is there a way to know from looking at this exhibit which of the two ways it was that that number ended up in there?

A. From what I am seeing here, again, I can't tell from here. If that number may have been called, I would assume it should be in the notes saying that, you know, we called the phone number and it's a bad number. I don't see that here. It's a little ineligible [sic] -- like I said, it's a little

65

Atkinson-Baker Court Reporters
www.depo.com

blurry but here nor there it doesn't look like that number is in the notes anywhere. So I am assuming it came over from the client as a bad number.

Q. Okay. And could we also assume that that number was never called by First Choice Assets?

A. I can assume that, yes.

Q. And can we assume that the only number called by First Choice Assets is the one phone number that was dialed twice?

A. From the notes and that, I can -- can I confirm 100 percent? No. But based on what I am seeing, yeah, it looks like that's the only phone number we called.

Q. Okay. At the bottom of the top screenshots where we talked about the old address being in there --

A. Okay.

Q. -- do you see that?

A. Yes.

Q. Can you explain why the old address and the new address match and why there is an entry for old address that matches the new address or the current address?

66

A. I mean, I can't explain 100 percent why. If the -- and I don't know if the collector did or not, they may have changed something in the top address. I mean, yes, does it look similar? It does, but I don't know if they may have changed something and it automatically dropped whatever they might have -- you know, it looks similar but I don't know if they changed anything and it would drop into that old address box. And I am not sure if there was another different old address in there previously.

Any time they change anything in the address up top, it automatically drops down to the bottom of that old address piece. Even if they typed -- if they retyped the whole thing over again, it would drop whatever the old address was.

Q. Oh, okay.

A. So I can't confirm if that's the actual old address or if there was something there previously, I don't know.

Q. But the fact that there is an old address at the bottom there means that somebody must have gone in and typed up a new address at the top,

67

Atkinson-Baker Court Reporters
www.depo.com

right, or retyped it in the top?

A. Well, they could have or -- like I said, I can't confirm. I mean, they could have. That's one way. Or it could have come over on the file as an old address. I can't answer the question completely.

Q. Okay. The bottom screenshot, that contains the collector's call notes, right?

A. That's correct.

Q. Okay. And in that, that's where the collectors can type in manually what happened when they attempted to reach out to the debtor, right?

A. Correct.

Q. And it seems from looking at this that it's a -- kind of a top fill in, like you fill it in from the top and the old stuff moves down to the bottom?

A. Yeah. So you see that top box that's up there, any time they click on any of the buttons on the right-hand side there depending if they left message, call out, call in, it goes up in that top box and then they type in. Ones they go back to the front screen, those notes will drop down to the lower box.

68

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q. So they will go into that top box and they will click one of those headers in the middle?

A. Yeah.

Q. And that will cause that header to go into the box?

A. That's correct. And then they can free type in there, you know, what happened on the call after that.

Q. And they choose themselves what they put in there, right?

A. That's correct.

Q. Okay. And they choose themselves what they're going to type in manually also, right?

A. That's correct.

Q. And when I say they choose themselves what they're going to put in there, I meant those headers in the middle, they can choose which one to click on themselves, right?

A. That's correct.

Q. Okay, all right. Now, when the collector types in manually what happened, they have some discretion on what goes there, right?

A. Correct.

Q. And they paraphrase, right? They kind of shorten everything that happens. They don't

69

give a blow by blow.

A. Right, it's abbreviated.

Q. Right. And in this one, the collector's abbreviated what happened, right? You listened to the phone calls.

A. Correct.

Q. Okay. Now, looking at the December 6 entry, that's the second call made, right?

A. Yes.

Q. And if you recall we talked earlier about you were listening to recordings as recently as today. The second call was the call that the person actually said "this is Yenma", right?

A. Correct.

Q. Okay. And that was the call that it was a woman that called, correct?

A. That's correct.

Q. Who was the woman?

A. Jennifer Heebner.

Q. Okay. And Jennifer, you remember hearing, asked Ms. Prendergast for her social security number, right?

A. I recall, yes.

Q. And also tried to confirm an address with her, correct?

70

A. That's correct.

Q. And do you remember in that conversation Ms. Prendergast saying something along the lines of "you can send whatever you want to that address"? Do you remember that?

A. Yeah, I believe so.

Q. Okay. So she did say her name was Yenma in that conversation, right, and she did say you can mail something to that address. Those were two things you heard, right?

A. Yes.

Q. None of that appears in the entry made by Jennifer on her collection notes, right?

A. Not that I can see.

Q. Well, would it be anywhere else?

A. No.

Q. Is there anything that's blocking you from seeing the entirety of this exhibit?

A. No, no, it's just -- like I said, it's a little blurry. If you want me to confirm exactly what it states, I can read -- you know, I can get some parts of it but not 100 percent.

Q. Well, my point is, really more happened in that conversation regarding identifying Yenma

71

Atkinson-Baker Court Reporters
www.depo.com

Prendergast than what was written by the collector, right?

MR. LITTLE: Form.

A. Yeah, I mean, again, we talked about abbreviating notes. Do they have to put every single thing in there? No. So there is abbreviations in there. Is it everything that happened on the call? No.

Q. So in order to know what really happened on this call, we have to listen to the recordings rather than just trust Jennifer's notes, right?

A. Correct, which is what I always do, yes.

Q. Wasn't the information that Ms. Prendergast gave on that call enough to suggest that you were talking to the debtor?

A. No.

Q. She confirmed her name and she confirmed her address. That wasn't enough?

MR. LITTLE: Object to the form.

A. Based on if I recollect the actual call, there was no confirmation of the address. She just said "you can go ahead and send it there" so --

Q. "You can go ahead and send it there"?

72

David J. Maczka
August 30, 2017

A. Right.

Q. This notice that they wanted to mail, right?

A. Mhmm, correct.

Q. Am I correct? There was a notice they wanted to mail to her and she said you can send it to that address, right?

A. I believe she said "go ahead and send it." I think it was something similar to that.

Q. Okay. But the collector wanted the social security number, right?

A. Correct.

Q. That was like this all-important information that the collector needed to have?

A. It is, yes.

Q. Okay. Now, First Choice Assets knows that people are reluctant to give out their social security number a little bit, right?

A. Correct.

Q. I mean, you'd have to have been sleeping under a rock for the last dozen years to not know that your social security is something you need to protect, that number, right?

A. Understood.

Q. Identity theft is rampant, do you agree?

A. Yes, I agree.

73

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

Q. Do you agree that giving a stranger your
social security number could result in
somebody opening accounts in your name if
you're not careful, right?

A. It could be, but that's why we only request
the last four.

Q. But still First Choice Assets has encountered
a certain reluctance on consumers to give up
their social security numbers, haven't they?

A. We have encountered it here and there, yes.

Q. I mean, especially if somebody -- a consumer
is out there getting a phone call, and they're
not told who they're speaking to.  It's a
complete stranger on the phone.  You would
expect a person to be a little reluctant to
give their social security number, right?

        MR. LITTLE:  Object to the form.

A. Yeah, I mean, I would assume.

Q. Now, in the calls that you listened to, at no
point did anybody say to Ms. Prendergast that
this call was from First Choice Assets, right?

A. That's correct.

Q. At no point did anybody say it's regarding her
J.B. Robinson Jeweler account, right?

A. That's correct.

74

Atkinson-Baker Court Reporters
www.depo.com

Q. At no point did they say "we're a debt collector calling to collect a debt", right?

A. That's correct.

Q. In fact, in what you listened to, there was absolutely no identification whatsoever of who this caller was and what this call was about, correct?

MR. LITTLE: Object to the form.

A. Correct.

Q. And yet the collector would not give that information out until they got the consumer's social security number, right?

A. The last four, correct. For fear of third-party disclosing, correct.

Q. Now, let's go to what I have marked as Exhibit 2.

A. Okay.

Q. This is the Operations Policy Handbook, right?

A. Correct.

Q. And what is the Operations Policy Handbook?

A. It's policies for the company.

Q. Why did the company make a policy handbook?

A. To instruct the employees on what our policies are for the company, their expectations.

Q. Okay. Does it also instruct them on

75

Atkinson-Baker Court Reporters
www.depo.com

compliance with laws?

A. It does.

Q. Would you agree with me that part of the reason why you have a handbook so that the employees can learn not to violate debt collection laws like the Fair Debt Collection Practices Act?

A. Yeah, that would be the purpose of the policies, correct, or a piece of it.

Q. Now, I understand that you redacted quite a bit of the handbook and I only have a portion of it.  I guess this would be the portion that would be relating to the situation we're dealing here with Ms. Prendergast, right?

A. That's correct.

Q. And you see on the first page of data that you gave me, you know, after the blacking out on the bottom of the first bit of writing?

A. Yes.

Q. Do you see that there?

A. Yes.

Q. I am holding it up on the screen.  And it's called identifying the consumer, right?

A. Yes.

Q. Okay.  And it says there that "when we place a

76

phone call to the consumer and a person answers the phone or we receive an inbound call we should, number one, ask for the consumer by first and last names." Do you see that?

A. Yep, yes.

Q. Did the collector ask for Ms. Prendergast's first and last name when you listened to the call?

A. I believe so, yes.

Q. I recall the first line of the collector being they're seeking location information from Ms. Yenma Prendergast. Do you remember hearing that?

MR. LITTLE: Object to the form. The recording speaks for itself.

A. I believe so.

Q. But what the collector is supposed to do is ask for Yenma Prendergast by first and last name, right?

A. They should identify them by asking for the first and last name, correct.

Q. Number two on the next page, turn to the next page of the exhibit. Number 2 says "if the consumer is the person that has placed a call

77

to you, answers your call, or subsequently takes your call, we must verify that the person we are speaking to is actually the consumer by asking for the following." Do you see that?

A. I do.

Q. Okay. So that's what you're telling the collectors that they're supposed to do to see to it that they're talking to the consumer, right?

A. Correct.

Q. The first thing they're supposed to do is "the last four digits of the consumer's social security number", right?

A. Correct.

Q. And that's what the -- that's what your collector did, right?

A. Correct.

Q. And Ms. Prendergast did not want to give that information out, did she?

A. Correct.

Q. She was pretty clear that she would not give out her social security number, right?

A. Correct.

Q. The next line of the instruction says "if the

78

Atkinson-Baker Court Reporters
www.depo.com

person does not want to give us that information, we should ask for, B, the consumer's address and date of birth."  Do you see that?

A.  I do.

Q.  She did not want to give the information of her social security number, we have covered that.  Did the collector then ask for the address?

A.  They asked for -- again, going back to the beginning of the call, as I recollect, they're asking to confirm the address which she never --

Q.  To confirm if this is an address, right?

A.  If it was the correct address, correct.

Q.  And Ms. Prendergast didn't say that's it but did say that she can go ahead and mail whatever she wanted to to that address, right?

A.  Correct.  There was no confirmation that that was the actual address.

Q.  Okay.  So then the next item would have been to ask for a date of birth, right?

A.  Correct.

Q.  So the consumer does not want to give you her social, you ask for an address and a date of

birth.  That's what they're supposed to do, right?

A. Yes.

Q. In the conversations you listened to, did they ever ask her for her date of birth?

A. No, and I am -- I can only assume because I am not the collector, but I can only assume because they couldn't validate the last four or they couldn't validate the consumer address they probably didn't ask for the date of birth at that point because they couldn't confirm two pieces of information at least.

Q. Well, they wouldn't confirm the last four but you have a policy for what happens when the last four is not confirmed, right?

A. Correct.

Q. And that is to ask for the address and date of birth, right?

A. Okay.

Q. Am I correct?

A. Correct.

Q. Did the collector ever attempt to confirm the date of birth?

A. Not that I can recall.

Q. Thank you.  In your system you can identify

80

all the consumers who you're collecting debts
for?

A. Correct.

Q. How many other Yenma Prendergasts are you
collecting debts for?

MR. LITTLE: He can't answer that
question. I am instructing him not to.

MR. SMITH: Why is that?

MR. LITTLE: Because he can't disclose
any other consumer -- personal identifying
information for other consumers we have in our
system.

MR. SMITH: I don't think you're doing
that.

MR. LITTLE: Well, fair point. You're
saying --

MR. SMITH: You know, I am going to just
say for the record --

MR. LITTLE: No, no. Hold on, hold on,
fair point. You're asking how many other
Yenma Prendergast -- you're asking him if
there are any other Yenma Prendergasts in the
system, correct?

MR. SMITH: Yes, if they're collecting
debts for anybody else named Yenma

81

Atkinson-Baker Court Reporters
www.depo.com

Prendergast.

MR. LITTLE: You can answer that question. He can answer that question. If you know.

THE WITNESS: 100 percent to say yes or no, I don't 100 percent know. This is the only account I pulled up. So is there other ones? I don't know. I don't believe --

BY MR. SMITH:

Q. Have you looked?

A. I did at the time when we got the lawsuit, but of course between now and then there is other accounts being loaded so I haven't looked more recently. So at the time I think -- I believe that may have been the only one.

Q. Fair point. Let's make that clear.

At the time that you got this lawsuit, in other words the phone calls that we discussed had already passed, when you got this lawsuit was there any other Yenma Prendergasts that you were collecting debts for?

A. I don't believe so.

Q. You agree that in every communication with a debtor First Choice Assets must identify the

82

call as an attempt to collect a debt?

A. After they confirm -- after they confirm they're speaking with the consumer, yes.

Q. Yeah.  My question is, to make it clear, in every communication with the debtor, okay, not with somebody you're not sure is a debtor, with the debtor, you must identify the call is from a debt collector, right?

A. That's correct.

Q. None of the collectors in these calls did that, right?

A. That's correct.

Q. You filed affirmative defenses in this matter, correct?

A. Yes.

Q. Okay.  And you answered the discovery in this case, we talked about that.  One of the questions I asked you was what facts do you have to support your defenses.  Do you remember that?

A. I don't recall but I am assuming, yes.

Q. Okay.  The answer that we received was that "Defendant has yet to learn of the facts to support its affirmative defenses and reserves the right to supplement this response up to

83

Atkinson-Baker Court Reporters
www.depo.com

and through trial."  Do you remember saying that?

A. I believe so, yes.

Q. Do you remember saying you have no facts to support your affirmative defenses at this time?

MR. LITTLE:  I think you just said yet to learn of facts, right?

MR. SMITH:  Has yet to learn, right.

MR. LITTLE:  Yeah.

Q. Have you today up to this point learned any facts since the day you answered this discovery of any facts about your affirmative defenses?

MR. LITTLE:  Object to the form.

Q. Did you learn anything new?

A. Not that I haven't known already, no.

Q. Okay.  If we could just take a five-minute break, that's all I need.  I am going to go through my notes.  I don't think I have a heck of a lot more, okay?

MR. LITTLE:  Sure.

A. Okay.

MR. SMITH:  All right guys.  Thanks.

(A short recess was taken.)

84

Atkinson-Baker Court Reporters
www.depo.com

MR. SMITH:  No more questions.

THE REPORTER:  Can I get your orders for the record, please?

MR. SMITH:  Yeah, I want a regular delivery transcript.  I like the condensed version.

THE REPORTER:  Any PDF or electronic or just the hard copy condensed?

MR. SMITH:  Yeah, I'd like the electronic.

MR. LITTLE:  I will take just an electronic copy is fine.

(Deposition concluded at 11:48 a.m.)

* * * * *

STATE OF NEW YORK)

         ) ss.

COUNTY OF ERIE   )

I, Carrie Fisher, Notary Public, in and for the County of Erie, State of New York, do hereby certify:

That the witness whose testimony appears hereinbefore was, before the commencement of their testimony, duly sworn to testify the truth, the whole truth and nothing but the truth; that said testimony was taken pursuant to notice at the time and place as herein set forth; that said testimony was taken down by me and thereafter transcribed into typewriting, and I hereby certify the foregoing testimony is a full, true and correct transcription of my shorthand notes so taken.

I further certify that I am neither counsel for nor related to any party to said action, nor in anyway interested in the outcome thereof.

IN WITNESS WHEREOF, I have hereunto subscribed my name and affixed my seal this 12th day of September, 2017.

_____
Carrie A. Fisher
Notary Public - State of New York
No. 01FI6240227
Qualified in Erie County
My commission expires 5/02/19

**Signature was requestd.**

Atkinson-Baker Court Reporters
www.depo.com

```
                E R R A T A   S H E E T
      Case Caption:
      DEPONENT:_____DATE TAKEN:_____
      I wish to make the following changes, for the
      following reasons:

      PAGE    LINE    CHANGE:
      _
      REASON:

      PAGE    LINE    CHANGE:
      _
      REASON:

      PAGE    LINE    CHANGE:
      _
      REASON:

      PAGE    LINE    CHANGE:
      _
      REASON:

      PAGE    LINE    CHANGE:
      _
      REASON:

      PAGE    LINE    CHANGE:
      _
      REASON:

      PAGE    LINE    CHANGE:
      _
      REASON:

      PAGE    LINE    CHANGE:
      _
      REASON:

      Signature:_____

      Subscribed and sworn to before me this
      ____day of _____2017.
      _____ Notary Public
```

87

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

CERTIFICATE OF WITNESS

I, the undersigned, have read the foregoing transcript, and the same is true and correct, save and except for the changes and/or corrections, if any, as indicated by me on the errata sheet attached hereto.

(Signed):_____

Dated:_____

Subscribed and sworn to me before this ____day of _____, 20__.

_____
Notary Public
My commission expires_____

88

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

**A**

a.m 1:15,16 85:14
AB095E9 1:24
abbreviated 70:2,4
abbreviating 72:5
abbreviations 72:7
able 18:20 48:4,17
absolutely 75:5
account 17:15 18:8 29:21,21,23,24 31:17 31:24 33:8 37:11,13,17 42:15 49:9,11 51:10,23 56:13 57:4 59:11,23 60:1,1,20 62:12 65:4 65:14 74:24 82:7
accounts 15:8,12 16:6 16:24 17:12,13,18,24 18:5,6 19:9 20:6 34:20 36:7,18 42:7,9,12 43:12,14 47:23 74:3 82:14
Act 24:14 25:15,19,24 26:11,21 27:15 46:19 76:7
action 10:24 11:8,11,12 12:16 86:15
actual 24:11 33:17 34:21 34:22 41:2 43:12 46:9 51:6 59:10,13 67:20 72:21 79:20
address 12:1,2 28:19 29:7 35:18,21 36:2,4 38:10 39:15,20,22 40:3 40:17,20 42:20,22 43:2 43:6,8,18,22 44:3 56:14 66:17,22,23,24 66:24,25 67:4,10,12,14 67:15,18,21,23,25 68:5 70:24 71:5,9 72:19,22 73:6 79:3,9,12,14,15 79:18,20,25 80:9,17
addresses 35:23 36:11 38:11,12 41:4,11,21,25 43:10 44:5,6,6,9,13 47:24
admissions 22:25 23:16 33:10
admit 35:14 44:23 45:8 45:17
affirmative 83:13,24 84:5 84:13
affirmatively 47:18 48:15 49:5
affixed 86:18
age 50:1
agency 65:7
agent 60:11,22,23
agent's 60:17
agents 48:3
ago 5:11 6:11,12,14,15 7:1 10:20 16:15 53:9 59:20
agree 47:9,12,12 56:9 73:24,25 74:1 76:3 82:24
agreement 31:12,16
ahead 72:23,25 73:7 79:17

all-important 73:12
alleged 25:5
allegedly 23:24 27:18 28:9 30:6 34:1
allow 22:20
American 26:14
amount 12:14
and/or 88:6
Anna 38:1 39:2
answer 8:15 10:6 18:2 21:12 22:16,21 27:25 33:18 43:13,13 47:16 47:18 48:15 49:5 56:11 58:7,10 68:5 81:6 82:2 82:3 83:22
answered 21:16 22:1,15 22:24 28:3 42:16 53:24 54:6 55:5 57:21 83:16 84:12
answering 8:19,24 9:2,4 23:6
answers 23:8,20 31:8 77:2 78:1
anybody 16:7,9 22:19 49:8,15 51:13 74:20,23 81:25
anymore 60:21
anyway 7:19 86:16
apologize 6:25 24:7 29:3 40:23 50:7 60:21
appear 49:3,4,11 64:24 65:1
appearing 2:4
appears 40:7,11,16,20 59:5 62:21 64:19,23 71:12 86:8
applicable 4:15
application 36:2 42:3
applications 59:9
applies 26:3
area 64:9
Aside 34:12
asked 16:15,22 22:7 23:23 27:17 28:1,8 32:3 41:12 42:5,5 44:17,23 58:1 70:21 79:10 83:18
asking 4:17 8:18,23 16:23 17:1 35:14 42:12 54:25,25 55:3,15 56:5 56:7 57:11 77:21 78:4 79:12 81:20,21
Assets 1:8 4:19 5:3,9 7:5 7:7,23 8:1 9:24 10:12 14:21 15:14 16:19 17:25 18:12 19:8,14 20:21 21:11 22:16 24:16 25:2,4,17,22 29:15 30:20 32:8 33:6 33:11 34:3,13,17 35:3 35:17 36:6,9 37:25 43:16 44:17 45:23 46:13 49:9 50:20 60:8 63:7 66:7,10 73:15 74:7,21 82:25
Assets' 26:4
assigned 60:8
assisted 23:6,19

associates 15:17,18 16:19 24:20 25:1 33:23 33:24 34:1 36:8
Association 26:14
assume 45:12,25 47:3 47:18 65:21 66:5,8,9 74:18 80:6,7
assuming 66:3 83:21
ATKINSON-BAKER 1:22
attached 88:7
attempt 28:25 29:19 31:19 33:3 80:22 83:1
attempted 23:25 28:10 30:4,7 68:12
attempting 27:23 28:15 28:17 29:24 33:2,25
attention 20:24
attorney 6:5 24:12 30:16 30:17 31:6 33:16,18,20 35:1,2
ATTORNEYS 2:2,7
August 1:15
Auto 17:19
automatically 60:18 61:24 62:2 67:7,14
Avenue 39:22 40:21
average 18:8,17,21,25
aware 9:11 20:20 35:17 35:20 42:18

**B**

B 3:11 79:2
B-A-D 64:10
bachelor's 14:6
back 12:15 30:5 34:21 50:9 62:16 68:24 79:10
background 7:10,11,16
bad 64:10,11,13,14 65:5 65:9,13,23 66:3
balance 18:8,17,21,25
ballpark 14:25 15:1 18:2
based 21:2,3,7,7,9 56:20 66:13 72:21
basis 44:8
beginning 79:11
belief 57:6
believe 5:4 25:17 26:3 31:25 37:2 40:1,2,19 52:8 53:23 54:21 55:4 55:23,25 56:16 57:25 61:23 62:2,3 63:6 71:6 73:7 77:10,17 82:8,15 82:23 84:3
believes 50:21
belonged 52:1
best 8:25 9:18 48:7,10 48:11 49:18 51:3,21
better 18:16 30:16 35:1 48:4
Bianca 16:4
biannually 26:19
big 64:9
birth 79:3,22 80:1,5,10 80:18,23
bit 9:14 15:7 33:14 60:4 62:5 73:17 76:11,18
blacking 76:17
blocking 71:17

blow 70:1,1
blurry 40:2,24 47:4,11,13 66:1 71:20
bold 64:9
bonus 21:9
bottom 40:6,12,16 42:21 47:6 66:16 67:15,24 68:7,18 76:18
box 40:20 59:14 60:11 62:24 63:14,18 67:10 68:19,23,25 69:1,5
boxes 64:7
break 8:11,15,16 41:1 58:14,16 84:19
BRENDAN 2:8
brings 36:5
Buffalo 1:14 2:9 14:3
Bureau 13:25
Burkard 38:1 39:2,3 48:25 49:8
business 10:8 12:6,23 14:2 17:7 26:4 32:11 34:16
buttons 68:21
buy 17:10
buyers 17:8

**C**

C 2:1
call 10:8 29:17 33:21 34:20 35:6,6 43:17,21 44:11 46:23 50:13 51:4 51:18 53:14,14 54:13 54:19 55:3 56:14 59:13 59:14 61:17,21 64:3 65:10 68:8,22,22 69:7 70:8,12,12,15 72:8,10 72:15,21 74:12,21 75:6 77:1,3,9,25 78:1,2 79:11 83:1,7
called 6:3 16:19 20:18 21:12 22:24 29:16 40:17 46:13,22 47:1,14 50:12 51:24 56:15 57:8 59:17 65:11,21,22 66:6 66:9,15 70:16 76:23
caller 75:6
calling 28:21 29:12,13 30:9 50:16,17 52:1,4,9 55:16 63:10 75:2
calls 20:4,9,11 28:23,24 32:9 46:15 51:13 52:20 53:24 54:4,23 55:1,1 70:5 74:19 82:19 83:10
capability 20:12
capacity 5:2 18:23,23,24
capital 64:9
Caption 87:2
career 13:11
careful 74:4
Carrie 1:11 86:5,21
case 4:18,20 5:19 6:1,16 7:2,14 21:10 52:21 63:21,21 83:17 87:2
cause 69:4
cease 61:9,14
cease-lawsuit 60:15 61:15

certain 62:3,15 74:8
CERTIFICATE 88:1
certify 86:6,12,15
change 50:24 51:1 61:13 67:13 87:5,7,9,11,13 87:15,17,19
changed 67:3,6,9
changes 87:4 88:5
check 44:9
Chicago 2:5 39:25 40:21
chief 16:10
Choice 1:8 4:19 5:3,8 7:4 7:7,23,25 9:24 10:12 11:24 14:21 15:5,14 16:18 17:25 18:12 19:8 19:13 20:21 21:11 22:19 24:16,22,23 25:2 25:4,17,22 26:4 27:23 29:15,24 30:20 32:8 33:6,10 34:3,13,16 35:3,16 36:6,9 37:25 43:16 44:17 45:23 46:13 49:8 50:19 60:8 63:7 66:6,10 73:15 74:7,21 82:25
choose 69:9,12,15,17
citation 24:5,9
Civil 4:14
claim 32:16
clarification 16:22 17:3 45:15
clarify 15:7
classes 14:13
classified 33:4
clear 16:18 41:9 58:4,5,8 78:22 82:17 83:4
clearer 41:13,14 50:7 58:10
clearly 49:19
click 59:14 68:20 69:2,18
client 4:2 15:14,16 16:19 38:9,22 40:4 43:8,10 44:2 47:15 50:21 61:6 61:21 65:3 66:3
clients 15:4,9,10,11 16:16 17:24 36:7
Code 4:14
collect 17:25 21:9 24:1 24:18,19,22,24 27:24 28:10,16 29:25 30:4,7 31:18,19 32:4 33:2,3,6 34:9,20 35:7 36:7 75:2 83:1
collected 62:12
collecting 25:4 29:19 30:3 32:12 34:4,12 36:10 81:1,5,24 82:22
collection 7:2 12:7 20:2 20:8 24:14 25:14,19,23 26:10,21 27:14 30:10 33:23,24 34:17 35:3 39:8 43:25 46:19 60:23 71:13 76:6,6
collections 12:18 13:2,5 13:7,13 19:3 58:25
collector 13:22,23 24:17 26:18 33:11 61:25 62:9 62:11 63:10 67:2 69:20 72:2 73:9,13 75:2,10

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

77:7,11,18 78:17 79:8 80:7,22 83:8
**collector's** 60:17 68:8 70:3
**collectors** 19:16 21:6 26:14 29:16 33:21 46:22 47:22 50:12 51:4 51:5 52:8 60:20 68:11 78:8 83:10
**collects** 24:23 25:2 62:10
**College** 14:8
**come** 6:6 20:23 42:7,10 58:8 63:3 68:4
**comes** 10:6 31:4 38:22 48:22 61:5
**commencement** 86:8
**commission** 21:2,7 86:23 88:17
**communicating** 8:5
**communication** 30:19 82:24 83:5
**companies** 7:17 9:23,23 10:4,10 11:14,16 12:8 17:9
**company** 6:18 7:18 19:1 24:16 25:6 35:4 75:21 75:22,24
**complaint** 60:16
**complaints** 10:6,7
**complete** 26:16 74:14
**completely** 68:6
**compliance** 7:17 9:22 10:3,6,16,17,22 11:3 11:13 12:9 19:6,7 76:1
**compliance-related** 10:9
**comply** 25:18,23 26:22
**concede** 30:8
**concerned** 30:14
**concluded** 85:14
**condensed** 85:5,8
**confirm** 29:7 41:3 43:18 52:5,14,16 54:2,10 55:12,17,19 56:20,22 57:14,16 63:11 66:13 67:20 68:3 70:24 71:20 79:12,14 80:11,13,22 83:2,2
**confirmation** 72:22 79:19
**confirmed** 72:18,18 80:15
**consumer** 15:8,12 16:24 17:23,24 20:13 29:8 30:21,24 31:9,21 32:5 32:9 33:4,5,8 34:12,17 35:9 36:13 50:18 51:6 51:9,18 63:24 64:1 74:11 76:23 77:1,4,25 78:4,9 79:24 80:9 81:10 83:3
**consumer's** 36:12 46:18 75:11 78:13 79:3
**consumer-based** 19:11
**consumers** 16:25 35:6 74:8 81:1,11
**contact** 16:25 48:12
**contains** 68:7

**Continue** 29:3
**control** 11:7
**conversation** 45:22 46:4 46:8 71:2,8,25
**conversations** 80:4
**convictions** 14:16,18
**convinced** 54:5
**copy** 85:8,12
**correct** 5:10 10:19 11:15 12:10 13:3 15:15,19 16:20 19:12 20:17 21:24 22:1,9,10,13,18 23:18,20 24:15,17,18 25:3,7,16 26:23,25 27:16 28:4,16 29:25 30:1,3,4 32:7,10,13,14 32:15,16,17,23 33:8,23 34:2,4,5,20 35:10 37:7 37:15 38:8,11,14,23 39:2,6,23,24 40:5,7,13 41:3 43:2,2,5,9,11,19 43:20,22,23 44:1,3 45:2,9 48:23,23 49:1,5 49:17 50:23 52:15,18 52:22 53:7,18 54:8,20 57:24 59:1,7 60:9,24 61:2,4,7,10,19 62:13 62:23 63:2 64:15,17 68:9,14 69:6,11,14,19 69:23 70:6,14,16,17,25 71:1 72:13 73:3,4,11 73:18 74:22,25 75:3,7 75:9,13,14,19 76:9,15 77:22 78:11,15,18,21 78:24 79:15,15,19,23 80:16,20,21 81:3,23 83:9,12,14 86:13 88:5
**corrections** 88:6
**correspond** 16:1
**counsel** 86:15
**County** 86:3,6,23
**couple** 53:1,9
**course** 82:13
**court** 1:1,22 8:19 9:6
**courtesy** 9:3
**courtroom** 5:24
**covered** 79:7
**creditor** 31:23,23
**Creditors** 13:7
**crime** 14:18
**current** 66:25
**currently** 9:21 10:1 14:22
**customers** 14:22

**D**

**Dan** 16:12,13
**data** 18:13 36:24 39:8 60:4 61:5,17,17 62:6 76:16
**date** 35:15 61:18,20 79:3 79:22,25 80:5,10,17,23 87:3
**Dated** 88:10
**David** 1:11 3:3 4:5,13
**day** 20:7 57:25 84:12 86:19 87:23 88:14
**days** 45:24
**dealing** 76:14

**debt** 7:2 12:7 13:12,22 13:23 17:8 20:2 24:1 24:14,17 25:5,14,19,23 26:10,21 27:3,14,14,19 27:22,24 28:11,15 29:20 30:3,7,9,10,19 30:21,24,24 31:2,9,21 32:11,24 33:2,4,11 35:3 45:25,25 46:18 75:1,2 76:5,6 83:1,8
**debtor** 43:17 57:22 61:22 68:13 72:16 82:25 83:5 83:6,7
**debts** 17:10 19:11 24:18 24:19,22,23,24 25:1 32:5,5,8,9 34:4,10,13 34:17 35:9 36:10 81:1 81:5,25 82:22
**deceased** 47:23
**December** 35:15,16 42:19,22 43:1 44:20,20 45:3,4 70:7
**defendant** 1:9 2:7 23:25 27:23 28:10 30:7 35:16 42:18 44:17 45:25 83:23
**defendant's** 6:8
**defenses** 83:13,19,24 84:5,14
**defer** 24:12
**define** 30:16 31:6 34:22 35:1
**defined** 24:1 27:19 28:11 30:10,21 33:11
**definition** 24:11 27:13,24 31:1,5,7 33:15,17 34:23
**definitions** 27:2 30:14 31:4
**degree** 14:6
**delay** 9:10,15
**delivery** 85:5
**denied** 27:20 31:8 33:12 35:18 42:20,22 44:25 46:1
**deny** 27:22 33:12 35:15 44:23 54:10
**denying** 46:10
**dep** 53:6
**depending** 68:21
**deponent** 6:9 87:3
**deposition** 4:13,18,22 5:8,12 6:4,6,13 7:12 41:6 85:14
**describe** 19:25
**described** 13:17
**DESCRIPTION** 3:12
**dialed** 64:21 66:11
**different** 7:18 9:22 13:6 13:8 14:21 17:20 20:5 35:23 36:4,22 40:9 49:10 51:22 56:17 57:10 59:5,9 64:19 67:11
**difficult** 6:22 8:4,22 30:13 31:3
**digital** 37:5 42:7
**digitally** 36:15 38:7 48:22

**digits** 39:18 47:9 49:20 62:25 63:19 78:13
**direct** 51:18
**director** 10:22 11:7 12:18 13:2,5,7,9,17 19:2
**disclose** 81:9
**disclosing** 75:14
**disclosure** 46:17
**discovery** 4:12 21:13,16 21:19 22:1,3,17,21 83:16 84:13
**discretion** 69:22
**discuss** 29:19,21
**discussed** 28:2,20 59:4 64:20 82:19
**discussing** 32:22
**dishonesty** 14:19
**disputes** 45:24
**District** 1:1,2 4:16
**DIVISION** 1:3
**DNF** 15:17,18,20,22,24 16:10,19 17:6 24:19 25:1 34:1 36:8,9,20 37:21 38:22
**document** 22:24 23:4,5
**documentation** 35:22 36:3 42:1
**documents** 22:9,23 37:10 57:5
**doing** 81:13
**dozen** 73:20
**Drive** 11:23,25
**drop** 67:10,17 68:25
**dropped** 67:7
**drops** 67:14
**duly** 4:7 86:9
**DVD** 26:15

**E**

**E** 2:1,1 3:1,1,11 39:22 40:21 87:1,1,1
**earlier** 32:3 33:15 49:23 70:10
**EASTERN** 1:3
**education** 14:5
**eight** 12:15 49:23
**Either** 55:22
**electronic** 85:7,10,12
**employee** 5:2 21:1
**employees** 19:13 26:10 26:20 33:21 75:23 76:5
**encountered** 74:7,10
**ended** 65:18
**entire** 13:1 63:7,9,12
**entirety** 71:18
**entry** 40:17 66:23 70:7 71:12
**equal** 12:14
**Erie** 86:3,6,23
**errata** 88:7
**especially** 74:11
**ESQ** 2:4,8
**estimate** 15:2
**estimating** 16:17
**event** 49:10
**eventually** 31:19
**Everest** 9:24 11:2,9,22

12:5
**exact** 15:3 17:23
**exactly** 17:16 55:19 56:23 59:22 71:21
**Examination** 1:10 3:2 4:10
**examined** 4:8
**executive** 16:10
**exhibit** 3:12 23:12 25:9 26:7 27:1,17 28:6 35:12 38:16 40:9 41:22 42:25 44:14 45:20 46:25 49:3 51:16 58:22 59:4 65:17 71:18 75:16 77:24
**exhibits** 3:13 41:6,8
**expect** 74:15
**expectation** 51:25
**expectations** 56:21 75:24
**expected** 26:2
**expecting** 51:5
**expert** 30:17
**expires** 86:23 88:17
**explain** 7:9,9 30:16 66:22 67:1
**explore** 58:9
**exploring** 17:6
**extend** 9:3

**F**

**fact** 67:23 75:4
**facts** 83:18,23 84:4,8,12 84:13
**fair** 24:13 25:14,18,23 26:10,20 27:14 30:10 46:18 76:6 81:15,20 82:17
**familiar** 4:20 15:23 24:5 24:8,13
**far** 15:9 16:24 19:1,6 30:13 31:1 33:15
**FDCPA** 26:15 30:22
**fear** 75:13
**Federal** 4:14
**fee** 62:6,9
**feed** 9:15
**feel** 58:7
**felony** 14:16
**field** 13:12 61:17,17
**file** 1:24 37:3,4 47:17 48:20,22 51:16 60:5,7 60:23 61:5 63:4 65:2 68:5
**filed** 83:13
**FileMaker** 59:3
**files** 36:6
**fill** 61:20 68:16,16
**filled** 60:11
**fills** 61:24
**Financial** 10:24 11:8,11 12:16
**find** 48:18
**fine** 32:14 45:17 85:12
**finish** 17:5 31:14
**finished** 9:1
**first** 1:8 4:7,19 5:2,8 7:4 7:7,22,25 8:16 9:24

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

10:11 11:24 14:21 15:4 15:14 16:18 17:25 18:12 19:8,13 20:21 21:11 22:19 24:16,22 24:23 25:1,4,17,18,22 26:3 27:23 28:17 29:6 29:9,15,24 30:19 32:8 33:6,10 34:3,13,16 35:3,16 36:5,9 37:25 43:16 44:17 45:23 46:4 46:12 49:8 50:19 51:2 53:10 59:17,24 60:8 61:3 62:17 63:7,22 64:2,5 66:6,10 73:15 74:7,21 76:16,18 77:4 77:8,11,19,22 78:12 82:25
**Fisher** 1:12 86:5,21
**five** 19:18 58:18 63:22
**five-minute** 84:18
**floor** 19:19,22,25 20:8
**follow** 26:2
**following** 78:4 87:4,4
**follows** 4:8
**foregoing** 86:12 88:4
**foremost** 29:9
**Forgetting** 30:18
**forgot** 39:1
**form** 13:18 16:21 24:3 25:20,25 26:5,12 30:11 30:23,25 32:20 34:19 35:5 46:6 52:11 54:1,7 55:7,8,24 56:19 57:9 72:3,20 74:17 75:8 77:15 84:15
**forth** 86:11
**Fountain** 1:14 2:9
**four** 10:13,20 11:1,5,6 39:18 47:9 49:21 62:25 63:25 64:5 74:6 75:13 78:13 80:8,13,15
**four-day** 44:25
**fraud** 14:19
**free** 69:6
**frequent** 44:8,12
**Friedman** 1:13 2:8
**front** 14:24 47:17 59:10 63:23 64:1,5 68:24
**FTP** 36:17,23,24 37:1
**full** 63:15,19 86:12
**funny** 50:3
**further** 29:11 50:6 86:15

**G**

**G** 29:8
**gain** 28:18,18
**gathering** 53:15
**general** 20:7
**getting** 9:10,12,14 17:2,3 17:4 39:4 50:1,9 74:12
**Getzville** 12:22
**give** 15:3 36:9 38:9 58:11 70:1 73:16 74:8,16 75:10 78:19,22 79:1,6 79:24
**given** 36:15 38:12 40:4 47:15 56:13
**giving** 74:1

**go** 26:16 35:12 38:15 41:2 46:23 64:3 68:24 69:1,4 72:23,25 73:7 75:15 79:17 84:19
**goes** 68:23 69:22
**going** 4:1,17 7:11,21 8:5 8:15 9:18 12:15 20:6 29:4,19 30:5 31:18 33:3 36:8 50:5 55:9 62:16 64:13 69:13,16 79:10 81:17 84:19
**good** 8:7 36:5
**gotten** 47:19
**Great** 13:25
**guess** 18:3 51:7 76:12
**guessing** 5:18
**guys** 9:13 84:24

**H**

**H** 2:8 3:11 87:1
**half** 5:14,18 6:12 7:1 12:25 13:1 26:15
**Hamburg** 14:10
**handbook** 75:18,20,22 76:4,11
**handle** 10:5 19:6,8
**handles** 16:4,5
**handling** 13:9
**happen** 49:14
**happened** 7:18 44:7 54:23 57:12 68:11 69:7 69:21 70:4 71:24 72:8 72:9
**happens** 69:25 80:14
**hard** 16:16 64:18 85:8
**hazard** 18:3
**head** 14:23
**header** 69:4
**headers** 69:2,17
**hear** 20:13 54:13
**heard** 53:24 59:20 71:10
**hearing** 57:5 70:20 77:14
**heck** 84:20
**Heebner** 70:19
**held** 1:11
**help** 35:2
**helping** 23:19
**hereinbefore** 86:8
**hereto** 88:7
**hereunto** 86:18
**Herman** 16:4
**highest** 14:4
**Hilbert** 14:8
**hold** 81:19,19
**holding** 76:22
**holds** 16:9
**honest** 54:2
**hoped** 64:21
**hopes** 52:6
**hoping** 51:6,7
**hour** 26:15
**hourly** 21:8

**I**

**idea** 18:17,21 54:3,16 56:11 57:18,21,24
**identification** 75:5
**identified** 28:5 29:5,10

65:3
**identify** 8:22 28:21 38:18 46:25 64:3 65:9 77:21 80:25 82:25 83:7
**identifying** 71:25 76:23 81:10
**identity** 6:7 73:24
**Illinois** 1:2 2:5 4:16 39:25 40:21
**imposter** 54:22
**inbound** 77:2
**including** 53:22
**income** 20:20 34:14
**incomplete** 44:6
**indicated** 88:6
**indication** 51:15
**ineligible** 65:25
**information** 14:24 18:15 19:4,5 22:16,20 28:18 36:9 37:6,11,13,17,18 37:20 38:5,6,21 39:4 42:8,15 44:19 45:5,7 49:4 53:14,15 55:12 60:2 62:21 63:3 64:24 72:14 73:12 75:11 77:12 78:20 79:2,6 80:12 81:11
**initial** 43:25 45:21
**initials** 15:22
**input** 61:14
**instruct** 75:23,25
**instructing** 81:7
**instruction** 78:25
**instrumentalities** 34:8
**Interchange** 13:8
**interested** 86:16
**interrogatories** 22:9
**inventory** 18:5
**investigation** 44:18,24 45:4,6,9,19 50:20
**involves** 14:18
**issues** 10:9
**item** 79:21

**J**

**J** 1:11 4:5
**J.B** 31:25 32:1 42:2 74:24
**January** 26:19
**Jennifer** 70:19,20 71:13
**Jennifer's** 72:11
**Jeweler** 17:18 74:24
**jewelry** 32:2
**job** 10:17 11:13 19:25 38:6
**Joe** 16:4
**June** 26:19

**K**

**kept** 18:11
**kind** 5:19 6:16 7:13,14 7:19 9:17 12:6 15:6 17:6,14 18:12 30:24 31:11 32:4,8 47:12 50:5,8 54:17 60:14 62:20 68:16 69:24
**Klein** 4:6
**knew** 21:25

**know** 6:5 7:12 8:7 9:4,10 9:12 11:16,20 12:8 16:9,12 17:1,6,9,11,12 17:12,16,17,22 18:1,2 18:4,4,15,20 19:2,4 20:3,5 24:10 26:1 28:20 30:8,14 31:1,2,3 33:15,20 34:22,24,25 37:16,18,21,22,23 39:12 42:2,14 43:5,7 44:4,11 46:20 47:21 48:11,14 49:23 52:8,13 52:18 53:16 54:8 56:1 56:2,10,22 57:4,11,13 58:2,6 65:5,16,22 67:2 67:5,8,9,22 69:7 71:22 72:9 73:20 76:17 81:17 82:4,6,8
**knowing** 19:5 42:22 49:15 57:3
**knowingly** 29:18
**knowledge** 18:7
**known** 84:17
**knows** 73:15

**L**

**L** 3:3
**Lakes** 13:25
**Larry** 2:4 9:9 41:12 58:1 58:16
**law** 1:12 26:1,3 33:19
**laws** 26:2 76:1,6
**lawsuit** 7:8 53:12,13 60:16 61:9,13 82:12,18 82:20
**layman** 34:24
**leads** 19:20 20:5
**lean** 30:15 35:2
**learn** 76:5 83:23 84:8,9 84:16
**learned** 84:11
**left** 11:12 39:17 62:18 68:22
**legal** 24:5
**let's** 8:7,25 9:18 28:6,6 31:21 38:15 46:23 58:22 75:15 82:17
**letter** 29:8
**letters** 36:22 44:10 64:9
**level** 14:4
**liar** 55:16
**line** 20:13 60:25 61:16 77:11 78:25 87:5,7,9 87:11,13,15,17,19
**lines** 62:4 71:4
**Lippes** 1:13 2:8
**listed** 35:24,25 36:1
**listen** 20:9,11 57:15 72:10
**listened** 52:23 53:4,11 53:17,21 54:12 55:3 56:24 70:5 74:19 75:4 77:8 80:4
**listening** 20:4,12 54:4 57:3 70:11
**listing** 48:5
**little** 2:8 4:3 5:15 9:9,14 13:18 15:7 16:21 24:3

25:20,25 26:5,12 30:11 30:23,25 32:20 33:14 34:19 35:5 37:2 40:1 40:24 41:5,12 46:6 47:4 52:11 54:1,7 55:7 55:24 56:19 57:9 58:1 58:5,12,15,18 59:13 62:5 65:24,25 71:20 72:3,20 73:17 74:15,17 75:8 77:15 81:6,9,15 81:19 82:2 84:7,10,15 84:22 85:11
**LiveVox** 20:19
**LLC** 1:8 4:20 24:16
**LLP** 1:13 2:8
**load** 43:14
**loaded** 36:18,25 82:14
**local** 4:15
**locate** 47:1
**located** 11:22,24 12:21 14:1,9 39:10
**location** 28:18 44:19 45:5 77:12
**long** 5:11 6:14 10:11,25 11:3 12:24 13:11,15 58:17
**longer** 12:23 14:2
**look** 5:15 18:16,18 22:5 27:2 28:6 42:4 47:8 48:13,18,20 63:13,18 66:1 67:4
**looked** 23:5 43:1 82:11 82:14
**looking** 7:15 15:2 23:22 26:7 27:1 29:7 39:13 40:8 42:24 46:25 47:6 57:4,23 64:18 65:16 68:15 70:7
**looks** 40:23,24 48:7 60:10 62:6 66:14 67:8
**lot** 84:21
**lower** 68:25
**lying** 54:22 55:6,10

**M**

**Maczka** 1:11 3:3 4:5,13 4:17 41:20 55:21
**mail** 34:3,9 71:9 73:2,5 79:17
**mailing** 44:9
**main** 59:21,22
**making** 20:3
**mall** 12:2
**manager** 18:14 37:22 38:3,5 60:12,18
**managerial** 13:16
**managers** 19:19,21
**manually** 68:11 69:13,21
**marked** 3:13 23:12 38:15 75:15
**match** 66:23
**matches** 66:24
**Mathias** 1:13 2:8
**matter** 7:22 83:13
**mean** 7:9 10:4 15:25 16:12 17:11,12,19 18:14 20:2 22:5,5 24:10 30:12 37:18

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

43:13 44:11 47:3 48:10 49:20 51:20 56:3 57:15 60:7,12 61:11 62:8,14 64:18 67:1,4 68:3 72:4 73:19 74:11,18
**means** 27:4 67:24
**meant** 45:16 69:16
**media** 16:2,4
**Mendez** 16:12,13
**mention** 50:3
**mentioned** 9:21 41:24
**mentioning** 9:17
**message** 68:22
**mhmm** 27:5 28:14 37:9 40:10 46:2,16 49:1 54:20 73:3
**middle** 64:8 69:2,17
**minutes** 58:18
**MIS** 37:22 38:3,4
**mislead** 47:11
**misspoke** 45:10
**misunderstood** 42:13 45:13,14,16
**moment** 16:15 27:8,9 59:20
**money** 21:9 33:25 34:1 35:10 62:11
**monitoring** 10:8
**Monroe** 2:5
**morning** 53:6,22 54:4,12 55:4 57:5
**move** 9:5 51:1 60:18
**moved** 13:8 65:13
**moves** 68:17
**Moving** 33:9
**multiple** 41:25 65:1
**municipal** 32:14

**N**

**N** 2:1 3:1
**name** 6:1,8 16:12 30:20 36:12 37:24 38:25 55:25 56:8 59:2 60:17 61:1,3 62:18 71:7 72:18 74:3 77:8,20,22 86:18
**named** 5:21 6:8 7:8 56:17 81:25
**names** 77:4
**National** 10:24 11:7,11 11:12 12:16
**near** 12:3
**necessarily** 44:4 52:3
**need** 8:11 41:1,4 48:18 50:2 55:19 58:17 63:21 73:22 84:19
**needed** 6:5 73:13
**neither** 86:15
**net** 20:20
**never** 28:5 45:23 46:7 66:6 79:13
**new** 1:14 2:9 4:6 12:22 14:10 66:23,24 67:25 84:16 86:1,6,22
**non-consumer** 19:9
**nonchalant** 55:18
**nonchalantly** 54:17
**normal** 15:25

**Northern** 1:2 4:16
**Notary** 1:12 86:5,22 87:23 88:16
**notes** 49:12 53:15 59:13 59:15 63:13 65:22 66:2 66:12 68:8,25 71:13 72:5,11 84:20 86:13
**notice** 1:16 4:14 29:8 43:25 73:2,4 86:10
**notification** 46:5
**number** 14:25 17:23 28:6 29:16 30:5 33:9 35:12 36:13 39:19 44:15 45:20 46:22 47:1,4,7 47:10,14,20 48:4,11,14 48:19 49:6,10,15,18 50:12,17,19,21,23 51:3 51:4,8,16,17,20,25 52:1,5,9,10,15,18 56:14,15 60:5,7 62:24 64:16,20 65:9,11,12,13 65:18,20,23,23 66:2,4 66:6,9,10,15 70:22 73:10,17,22 74:2,16 75:12 77:3,23,24 78:14 78:23 79:7
**numbers** 15:1 36:11 47:24 48:6,21 50:24 51:2,10,21 64:11,14 65:5 74:9

**O**

**oath** 21:19,22 22:12 23:4
**Object** 25:25 26:5,12 30:11,23,25 34:19 46:6 52:11 54:1,7 55:8,24 56:19 57:9 72:20 74:17 75:8 77:15 84:15
**Objection** 55:7
**obligation** 23:24 27:18 28:9 29:14 30:6
**obligations** 35:7,8
**obtain** 51:8
**obtains** 36:6,6
**obviously** 8:12 19:4 20:3 29:6 60:13 63:23 65:10
**occupations** 10:1
**off-track** 7:19
**offhand** 22:6 37:23
**office** 29:22,23
**officer** 7:17 9:22 10:3,16 10:18 11:3,14 12:9 16:10 19:6
**offices** 1:12
**Oh** 36:23 67:19
**okay** 4:24 5:7,11,24 6:1 6:13,16 7:4,7,19,24 8:10 9:7,8,19,20 10:17 10:20 11:2,12 12:11,15 13:4 14:4,13,16 15:13 16:15 17:9,14,22 18:7 19:8,13,24 21:1,6,10 21:15,21 22:14,23 23:3 23:8,11,19,22 25:8,10 25:11 26:7 27:12,13,17 29:5,23 30:5,5 31:15 32:3 33:9,24 34:2,8,12 34:16 35:11,13,20,24

36:21 37:16 38:6,15 39:10,13,17 40:3,6 41:17,24 42:17 44:7,16 45:14,20 46:3,10,22 47:14 48:2,10 49:2,18 50:11 51:15,24 52:23 53:10,21 55:2 58:10,22 58:23 59:19 60:4,7,10 60:22 61:8,16 62:4,16 62:19 63:5 64:6,16,24 66:5,16,19 67:19 68:7 68:10 69:12,20 70:7,15 70:20 71:7 73:9,15 75:17,25 76:25 78:7 79:21 80:19 83:5,16,22 84:18,21,23
**old** 35:25 36:1 40:17,20 44:5 66:17,22,24 67:10 67:11,15,17,20,23 68:5 68:17
**once** 61:12
**ones** 64:20 68:24 82:8
**opening** 74:3
**operations** 13:10 20:7 75:18,20
**order** 64:3 72:9
**orders** 85:2
**original** 31:23 36:2 42:3 42:17 47:17 48:20,22 65:2
**originally** 37:12
**outcome** 86:16
**outsourcing** 16:5,6
**outstanding** 29:14 35:7 35:8
**oversee** 10:7 19:19,21 19:24
**overseeing** 20:7
**owe** 34:1
**owed** 23:24 25:5,5 27:18 28:1,9 29:14 30:6 32:24 35:10
**owing** 45:24
**owners** 11:21
**ownership** 11:17
**owns** 25:1

**P**

**P** 2:1,1,4
**P.C** 2:3
**page** 3:2,12 40:11 63:13 63:16 64:6 76:16 77:23 77:24 87:5,7,9,11,13 87:15,17,19
**paid** 62:6,9
**paper** 17:21
**paraphrase** 69:24
**part** 10:5,8 30:19 37:19 76:3
**particular** 23:4 33:2 51:24
**parts** 71:22
**party** 6:3,7 7:8 86:15
**pass** 26:17
**passed** 82:20
**PDF** 85:7
**pending** 8:13,14
**people** 15:23,25 16:3

32:9 33:25 46:17 51:1 51:1 54:24 73:16
**percent** 15:21 21:4 43:3 43:5,7,15 49:25 62:3,7 62:7,9,10,11,14,15 66:13 67:1 71:23 82:5 82:6
**perfectly** 45:17
**performed** 44:18,24 45:5 45:18
**period** 44:25
**person** 22:16 46:12 48:12 52:7,17 55:19 56:8,15,17 63:10 70:13 74:15 77:1,25 78:3 79:1
**person's** 37:23,24
**personal** 81:10
**personally** 32:18
**perspective** 7:16
**phone** 28:23,23,24 36:11 47:10,19,24 48:4,6 49:6,10,18 50:17,19,24 51:2,8,13,20 52:4,20 54:6,9 55:5 56:14 57:21 61:21 64:11,14 64:16,19 65:11,23 66:10,15 70:5 74:12,14 77:1,2 82:19
**phone's** 56:8
**phones** 34:9
**picking** 58:22
**piece** 19:7 47:6 59:12 67:15 76:9
**pieces** 80:12
**place** 76:25 86:10
**placed** 77:25
**plaintiff** 1:6 2:2 6:8 23:24 28:2,9 30:6 46:9 56:10 57:17
**plaintiff's** 35:17 42:19
**Plaza** 1:14 2:9
**please** 8:3 58:11 85:3
**plenty** 40:15
**plug** 20:16
**point** 29:6 36:5 71:24 74:20,23 75:1 80:11 81:15,20 82:17 84:11
**pointing** 64:8,12
**policies** 56:21 75:21,23 76:9
**policy** 44:9 52:15 75:18 75:20,22 80:14
**pops** 64:2
**portal** 16:4 37:3,4
**portion** 25:14 26:13 62:6 62:17 63:8 76:11,12
**position** 10:25 13:16,21 16:10
**positive** 49:25
**possible** 47:24 50:23 54:21 56:12,16
**Possibly** 53:19
**post-baccalaureate** 14:13
**potentially** 52:9
**practice** 43:17,20
**Practices** 24:14 25:15,19 25:23 26:11,21 27:15

30:10 46:19 76:7
**Prendergast** 1:5 4:19 7:22 21:11 23:25 27:18 28:4,19,25 29:2,17,18 32:12,21,24 41:21 45:22,24 46:4,14,23 47:2 50:14,18,22 52:2 53:25 54:6 56:2,13,18 57:7,17 61:1 62:22 64:22 70:21 71:3 72:1 72:14 74:20 76:14 77:13,19 78:19 79:16 81:21 82:1
**Prendergast's** 30:20 44:19 77:7
**Prendergasts** 81:4,22 82:21
**present** 41:7
**presented** 48:21
**president** 16:11
**pretty** 21:21 78:22
**previously** 67:12,22
**primary** 34:16 59:18
**prior** 30:12
**privy** 19:5
**probably** 6:15 53:3,9 80:10
**problem** 46:7
**Procedure** 4:15
**process** 10:5
**professional** 13:11
**program** 59:9
**protect** 73:22
**protocol** 37:4
**provide** 23:19 36:14 46:5 63:24,25
**provided** 22:16,20 24:9 31:8 41:13 43:8,10
**Public** 1:12 86:5,22 87:23 88:16
**pull** 23:12 25:8 41:2 53:14 59:11,23,25 60:20
**pulled** 82:7
**pulling** 50:6
**purchase** 17:11,21
**purchasing** 32:18
**purpose** 76:8
**pursuant** 1:16 4:13,14 86:10
**put** 51:3,22 61:9 62:1,2 63:20,22 69:9,16 72:5
**putting** 39:4

**Q**

**Qualified** 86:23
**quality** 10:7,22 11:7
**question** 8:2,7,13,14,23 8:24 9:1,5 15:7 22:6 24:7 28:1 33:19 42:11 42:14,16,17 49:6 56:5 56:7 58:9 68:6 81:7 82:3,3 83:4
**questions** 4:18 7:21,25 8:18 16:1 23:9 28:3 31:22 33:16 55:11 57:10,12 83:18 85:1

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

quick 46:24 58:14,16
quite 76:10

---
**R**

R 2:1 87:1,1
rampant 73:24
rate 21:8
reach 50:18 51:6 52:2,7
  68:12
reached 29:17,18 30:2
read 4:2 27:8,9,19 34:23
  34:24 71:21 88:3
readers 50:2
real 57:16
reality 44:5 52:12 57:15
realize 8:4
really 7:20 17:20 31:4,6
  40:25 46:24 55:6 71:24
  72:9
reason 8:11 16:22 46:10
  57:11 65:2 76:4 87:6,8
  87:10,12,14,16,18,20
reasons 87:4
recall 5:20 6:2,10 21:21
  22:14,15,25 70:10,23
  77:11 80:24 83:21
Receivable 9:24 12:5
Receivables 11:2
receive 53:13 60:15
  61:13 77:2
received 48:15 53:12
  83:22
receives 37:25
recess 58:19 84:25
recognize 23:14 25:11
recollect 72:21 79:11
record 4:12 31:12,17
  81:18 85:3
recording 77:16
recordings 52:19,23
  56:25 57:3,16,22 70:11
  72:10
recover 33:25
Recovery 12:20,21
redacted 76:10
Redline 12:20,21
refer 17:14,15 33:16
  34:21
reflect 4:12
refuse 50:8
regard 28:11
regarding 7:22,25 71:25
  74:23
regards 6:19 7:10 16:6
  24:10 29:12 32:21
  33:17,19 36:13 42:12
  42:14 56:5,7 57:13
regular 85:4
Reiter 19:23
reiterate 60:14
related 86:15
relating 76:13
relation 11:17
reluctance 74:8
reluctant 73:16 74:15
remember 5:17 6:1,3,10
  6:16,19 21:13,15,18
  22:3,6,8,17 36:8 59:21

70:20 71:2,5 77:13
  83:20 84:1,4
repeat 24:7
rephrase 8:3
reporter 4:1 8:19 9:6
  85:2,7
REPORTERS 1:22
request 22:25 23:16,23
  33:9 44:15 74:5
requests 22:3
reread 45:10
reserved 60:22
reserves 83:24
residential 35:17,21 38:9
  42:19
respond 10:7
response 83:25
responses 23:17,22
responsible 39:3
result 74:2
retyped 67:16 68:1
Rhonda 19:23
right 9:21 12:3,24 17:2,4
  21:10,23 22:12 24:14
  24:20 25:6,15 26:24
  27:15 32:6,9,12,19
  33:22 34:1,18 35:4
  37:8 38:10,13,24 39:3
  39:5 40:9,12,18,22
  41:17 43:8 46:19 48:13
  48:22,25 49:3 50:22
  52:7,17,21 53:17 54:19
  57:1 59:6,25 60:25
  61:1,3 62:5,22 64:6,16
  64:22 68:1,8,13 69:10
  69:13,18,20,22,24 70:2
  70:3,4,8,13,22 71:8,10
  71:13 72:2,12 73:1,2,6
  73:10,17,22 74:4,16,21
  74:24 75:2,12,18 76:14
  76:23 77:20 78:10,14
  78:17,23 79:14,18,22
  80:2,15,18 83:8,11,25
  84:8,9,24
right-hand 63:14,16
  68:21
rights 46:18
road 4:6 12:3
Robinson 31:25 32:1
  42:3 74:24
rock 73:20
role 13:9
room 8:21
rules 4:15

---
**S**

S 2:1 3:1,1,11 87:1
salary 21:3,4,7
salary-based 21:1
Santander 17:19
sat 7:13 21:22
save 88:5
saw 22:4 23:8
saying 6:11,23,25 8:20
  19:1 45:3 46:3 51:11
  54:13 57:20 64:14
  65:22 71:3 81:16 84:1
  84:4

says 39:22 40:1,2 48:7
  58:2 60:5,10 62:6
  64:11 76:25 77:24
  78:25
screen 59:10,11,16,17
  59:17,18,21,23,24,25
  63:17,23 64:1,2,7
  68:24 76:22
screenshot 40:7,16
  42:24,25 48:5,6 68:7
screenshots 38:19 39:13
  40:9 42:2 58:24 59:5
  66:16
scrub 47:22 65:8
scrubbed 49:9
scrubbing 49:11
seal 86:18
sec 35:11
second 9:10,15 23:23
  54:13 58:11 59:12,15
  63:16,17 70:8,12
section 27:1 39:14,17
  63:13 64:25
secure 36:24
security 36:12 39:19
  62:24 70:21 73:10,17
  73:21 74:2,9,16 75:12
  78:14,23 79:7
see 18:20 24:2 27:6,20
  31:11,16 35:18,19
  38:16 39:17,20 41:20
  41:23 44:21,25 46:1
  47:3,6,10,23 48:4,8,21
  49:19,22,22 59:12,13
  59:24 60:5,14 61:18
  63:1,12 64:10,13 65:24
  66:20 68:19 71:14
  76:16,20 77:4 78:5,8
  79:4
seeing 9:16 21:15 22:25
  65:19 66:14 71:18
seeking 77:12
seen 18:24
send 29:7 65:4 71:4
  72:23,25 73:5,7
sending 37:17,21
sends 37:22 43:24
sent 22:24 23:13 24:19
  25:8 36:15,17,17,19,23
  36:24 37:5 42:13 61:5
separate 11:14,21
September 86:19
Services 9:25 10:24 11:8
  11:11 12:5,17
set 63:18 86:10
setting 20:5
seven 58:2
shaded 64:8
sheet 88:7
short 58:19 84:25
shorten 69:25
shorthand 86:13
shows 39:14 62:17
sic 65:25
side 49:15 62:5 63:14,16
  64:6 68:21
sign 4:2 23:3
Signature 87:21

signed 21:18 22:11 88:9
similar 33:14 67:5,8 73:8
single 43:17,21 72:6
sir 22:2
sit 48:13 53:23 57:20
situation 44:12 57:12
  76:13
six 6:15
skip 47:21 48:1
sleeping 73:19
slot 51:21
slots 51:23 65:13
Smith 2:4 3:3 4:11 9:16
  19:23 41:8,17,19 58:3
  58:7,13,17,21 81:8,13
  81:17,24 82:10 84:9,24
  85:1,4,9
SMITHMARCO 2:3
social 36:12 39:19 62:24
  63:8,9,11,15,19 70:21
  73:9,16,21 74:2,9,16
  75:12 78:13,23 79:7,25
somebody 65:3,11 67:24
  74:3,11 83:6
Sonwil 11:23,25
sorry 6:23,24 17:24 29:2
  35:11 36:21,23 42:5
  56:6
sounded 54:17
South 39:22 40:21
speak 28:25 55:20 56:25
  57:13
speaking 9:11 28:5,12
  28:22 29:11 46:21 52:6
  52:17 54:16 55:13
  56:22,24 57:14 64:4
  74:13 78:3 83:3
speaks 77:16
specific 17:14 42:11
specifically 42:15
specifics 18:3
spend 12:12
spoke 31:20 32:3 46:12
  46:13
spot 60:17,22 64:8
ss 86:2
stand 15:20 38:4
stands 37:2
start 7:20 9:2 10:15
  28:17 58:22
started 10:14 13:6 42:18
starts 27:3 47:5 60:25
state 55:9 86:1,6,22
stated 45:23
statement 35:14 52:4
  55:18
states 1:1 71:21
statistics 18:8,12
status 60:14 61:8,11,12
  61:13,15,16
statute 24:8
Sterling 17:18
store 32:2
stranger 74:1,14
Street 2:5
strike 26:8
strip 12:2
stuff 38:24 40:14 68:17

subject 52:20
subrogation 32:16
subscribed 86:18 87:22
  88:13
subsequently 78:1
suggest 72:15
Suite 1:14 2:5,9
supplement 83:25
supplied 35:23
supply 36:11
support 13:10 83:19,24
  84:5
supposed 20:1 50:16
  77:18 78:8,12 80:1
supposedly 31:20
sure 9:4 15:21 16:23
  17:20 18:15 20:3 28:3
  28:7 32:22 37:19 41:10
  43:15,21 47:16 58:15
  58:17 67:11 83:6 84:22
sworn 4:7 86:9 87:22
  88:13
system 18:16,19 20:15
  20:18,19 36:18,25
  37:14 38:7,13,19,20
  39:5,7 40:11 43:19
  48:24 50:13 58:25 59:2
  80:25 81:12,23
systems 38:5

---
**T**

T 3:1,11 87:1,1
take 8:11,14,16 9:6,18
  26:18 27:8,8 38:6 41:1
  58:12,14,16 84:18
  85:11
taken 4:13 14:14 58:19
  84:25 86:10,11,13 87:3
takes 78:2
talk 16:5
talked 33:14 49:23 66:17
  70:10 72:4 83:17
talking 8:22 9:13 15:6,8
  15:8 32:23,25,25 33:1
  38:20 42:15 46:8 50:4
  72:16 78:9
team 16:2 19:20 20:4
telephone 45:22
telephones 34:6
tell 8:3 12:11 21:25 27:11
  37:1 40:25 45:16 51:4
  65:14,20
telling 16:17 42:8 78:7
term 27:3 31:2
terminology 59:19
terms 34:24 52:16
test 26:17,18
testified 4:8
testify 5:24 6:4 41:10
  86:9
testimony 86:8,9,10,11
  86:12
text 25:11
Thank 80:25
Thanks 58:13 84:24
theft 14:19 73:24
thereof 86:16
thing 22:11 67:16 72:6

David J. Maczka
August 30, 2017

Atkinson-Baker Court Reporters
www.depo.com

78:12
**things** 16:2 19:3 24:12 30:15 42:9 47:25 53:13 71:10
**think** 9:13 15:4 25:22 40:8 45:18 47:4 55:10 56:12 59:4,20 73:8 81:13 82:15 84:7,20
**third-party** 51:17 52:10 75:14
**thought** 36:21
**three** 19:20 36:21 49:22 53:3,16,20,22
**Tim** 19:23
**time** 5:11 7:5,18 9:18 12:12,14 16:16 40:15 43:11 49:7 53:4,8,10 58:12 60:13,15 64:18 67:13 68:20 82:12,15 82:18 84:6 86:10
**times** 4:24,25 5:1,7 52:25 53:3,16,20,22 54:15,23,24 58:2
**title** 38:2
**today** 21:23 53:5,8,23 57:4,20 70:12 84:11
**told** 74:13
**top** 14:23 39:14,17 40:11 40:16 48:5,6 59:10 60:1,4 64:7 66:16 67:4 67:14,25 68:1,16,17,19 68:23 69:1
**topic** 50:3
**total** 13:11 18:5
**touched** 62:20
**tracing** 48:1
**track** 50:10
**train** 26:9,13 52:13 63:23
**trained** 26:20
**training** 10:5 52:12
**transcribed** 86:11
**transcript** 85:5 88:4
**transcription** 86:13
**transfer** 37:3,4
**trial** 1:10 84:1
**trick** 8:9
**tried** 70:24
**true** 52:3 86:12 88:4
**trust** 44:2,4 72:11
**truth** 21:25 86:9,9,10
**try** 8:7 9:3 29:19 47:23 50:6,17
**trying** 6:20 8:9 30:13 31:3,18 34:22 42:21 47:6 52:5 54:15 55:11 57:19 58:3,8
**turn** 44:14 45:20 77:23
**turning** 11:2
**Twenty-five** 13:14
**Twenty-three** 19:17
**twice** 66:11
**two** 4:25 5:7 7:17 9:22,23 11:14,17,21 12:14 13:6 13:20 19:19,21 26:15 35:22 40:8 41:3 52:19 53:2,3 57:10 58:24 59:5,8 65:14,17 71:10 77:23 80:12

**type** 68:11,23 69:6,13
**typed** 67:16,25
**types** 17:20 20:5 69:21
**typewriting** 86:12

**U**

**U.S.C** 24:1,6 33:19
**unable** 51:8
**underneath** 62:16
**undersigned** 88:3
**understand** 8:2,6,8 22:8 23:3 28:7 31:6 34:24 50:24 76:10
**understanding** 24:11 31:4
**Understood** 8:17 24:13 73:23
**unfortunate** 41:9
**UNITED** 1:1
**upfront** 47:25
**upload** 38:7
**uploaded** 37:14 38:12,21 38:25 48:24
**uploading** 43:12
**use** 26:14 63:22
**uses** 34:3,6
**utilize** 61:12
**utilized** 65:6

**V**

**valid** 46:1
**validate** 80:8,9
**validated** 46:7
**value** 20:24
**verify** 78:2
**version** 41:13,14 85:6
**versus** 4:19 7:22 21:11
**video** 9:15
**videoconference** 2:4 8:6
**Videoconferenced** 1:10
**violate** 76:5
**vision** 50:5,7
**voice** 52:19 53:24 54:9
**vs-** 1:7

**W**

**W** 2:5 3:1
**wait** 9:1
**want** 8:14 14:25 16:18 17:4,5 30:8 31:11,16 41:6,10 45:10,14,15 47:11 53:20 71:4,20 78:19 79:1,6,24 85:4
**wanted** 7:12,20 73:2,4,9 79:18
**wants** 63:11
**wasn't** 16:23 32:11,14,16 55:6 72:14,19
**waterfall** 48:1
**way** 5:9 9:5 14:14 30:18 55:10 58:9,10 65:16 68:4
**ways** 34:4 65:1,14,17
**we're** 8:20 9:10,14 17:2,4 26:2 29:6 32:22 52:16 75:1 76:13
**Wednesday** 1:15
**weeks** 53:9

**welcome** 8:12
**went** 11:13 29:11
**weren't** 32:22
**West** 4:6
**Wexler** 1:13 2:8
**whatsoever** 75:5
**WHEREOF** 86:18
**wife** 50:4
**Williamsville** 4:6
**wish** 87:4
**witness** 3:2 5:21,22,23 6:4,9 7:13 58:14 82:5 86:8,18 88:1
**woman** 38:25 53:23 55:5 55:21 57:21 70:16,18
**woman's** 54:9
**words** 46:11 82:19
**work** 11:9,17 12:8,24 15:9,23 16:25 17:13 20:6
**worked** 13:5,12 65:4
**worker** 5:2
**working** 7:4 10:11 11:6,9
**wouldn't** 39:10 46:20 52:17 65:10 80:13
**writing** 76:18
**written** 21:12,15 26:1,2 72:1
**wrong** 40:8 44:6,13 65:12
**wrote** 61:8
**www.depo.com** 1:23

**X**

**X** 3:11

**Y**

**yeah** 6:12 15:1,25 16:12 16:14 17:16 18:14 31:8 36:17 45:12,18 51:12 52:6 54:17 55:13 56:3 59:10 63:17 66:14 68:19 69:3 71:6 72:4 74:18 76:8 83:4 84:10 85:4,9
**year** 5:13,13,17 6:11,12 7:1 12:25 13:1 14:11
**years** 6:15 10:13,20 11:1 11:5,6 12:15 13:14,15 13:16,19,20 20:21 73:20
**Yenma** 1:5 28:4,19,25 29:2 32:21,23 50:18 53:25 54:6,14,18,19 55:6,14,16,18,21,22,25 56:1,2,3,9,13,16,18,18 57:7,17 70:13 71:7,25 77:13,19 81:4,21,22,25 82:21
**Yep** 22:18 48:9 50:25 77:6
**York** 1:14 2:9 4:6 12:22 14:10 86:1,6,22

**Z**

**zero** 49:22

**0**

**01FI6240227** 86:22
**0882** 47:10
**0883** 49:24

**1**

**1** 23:12 27:17 28:6 35:12 44:14
**1:17-cv-00316** 1:7
**10:03** 1:15
**100** 15:21 21:4 43:3,5,7 43:15 49:25 62:3,15 66:13 67:1 71:22 82:5 82:6
**11:48** 1:16 85:14
**11134** 39:22 40:21
**1200** 2:5
**12th** 86:19
**14202** 2:9
**14221** 4:7
**15** 24:1,6 33:19
**15-** 18:6
**1592** 24:6
**1692(6)** 33:12
**1692a** 27:2
**1692a(5)** 24:2,6 28:11
**1700** 1:14 2:9

**2**

**2** 28:6 30:5 35:15,16 44:20 45:3 75:16 77:24
**20** 88:14
**20,000** 18:6
**2016** 35:16 44:20
**2017** 1:15 86:19 87:23
**22** 35:12
**23** 13:19
**25** 13:15
**28** 19:15,16
**288-3376** 1:23
**29** 44:15
**2nd** 42:19,23 43:1

**3**

**3** 33:9
**30** 45:24 62:7,14
**30th** 1:15
**312** 2:6
**324-3532** 2:6
**35** 45:20
**357** 4:6

**4**

**4** 3:3 38:16 42:25 46:25 49:3 51:16 58:22

**5**

**5** 25:9 26:7 27:1,3,3
**5/02/19** 86:23
**50** 1:13 2:9
**55** 2:5

**6**

**6** 44:20 45:4 70:7
**60** 62:7,9,10,11
**60603** 2:5

**7**

**716** 2:10
**733** 47:5

**8**

**800** 1:23
**853-5100** 2:10

**9**

**93** 14:12

David J. Maczka
August 30, 2017